# CIMIOTTI UNHAIRING COMPANY *v.* AMERICAN FUR REFINING COMPANY

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 192. Argued March 17, 1905.—Decided May 15, 1905.

A greater degree of liberality and a wider range of equivalents are permitted where the patent is of a pioneer character than when the invention is simply an improvement, although the last and successful step, in the art theretofore partially developed by other inventors in the same field.

The patent involved in this case for the unhairing of seal and other skins, while entitled to protection as a valuable invention, cannot be said to be a pioneer patent.

In making his claim the inventor is at liberty to choose his own form of expression and, while the courts may construe the same in view of the specifications and the state of the art, it may not add to or detract from the claim.

As the inventor is required to enumerate the elements of his claim no one is the infringer of a combination claim unless he uses all the elements thereof.

Where the patent does not embody a primary invention but only an improvement on the prior art the charge of infringement is not sustained if defendant's machines can be differentiated.

THIS action was begun in the Circuit Court of the United States for the District of New Jersey for the purpose of enjoining the alleged infringement of certain letters patent of the United States, issued to John W. Sutton, and bearing date of May 22, 1888, number 383,258, for a certain new and useful invention or improvement upon machines for plucking furs.

In the Circuit Court a decree was rendered granting an injunction, 120 Fed. Rep. 672; upon appeal to the Circuit Court of Appeals for the Third Circuit this judgment was reversed, and the cause was remanded to the Circuit Court with directions to dismiss the bill.   123 Fed. Rep. 869.

The case was brought here upon writ of certiorari to review the judgment of the Circuit Court of Appeals.

*Mr. Louis C. Raegener* for petitioners.

*Mr. Henry Schreiter* for respondents.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

The patent in controversy has been frequently sustained in the Federal courts (95 Fed. Rep. 474; 108 Fed. Rep. 82; 115 Fed. Rep. 498 and 507), and its validity is not contested here.   The question presented to us is one of infringement. The invention which is the subject matter of the controversy relates to machinery for unhairing pelts, and particularly and perhaps, exclusively, so far as practical use is concerned, sealskins or "coney" skins.   The latter are skins of French or Belgian rabbits, which, under the name of "electric" sealskins, have been put upon the market, and have been largely sold and used as substitutes for the genuine sealskins.   It is said that only an expert can tell the difference between the finished coney and the genuine sealskin.

It is disclosed in the testimony that sealskins, before they are fit for the market, are required to be submitted to a process by which the long hairs, sometimes called "water hairs," are separated from the fur and clipped or plucked from the pelt. Up to about the year of 1881 the removal of such hairs was effected by hand, the pelt being stretched over the finger; by blowing down on the fur a part was made, and the hairs were clipped out by means of scissors.  This was necessarily a slow

and laborious process.   An improvement was made in this art by the Cimiottis, predecessors of the petitioner, by the introduction of an air blast for the purpose of separating the fur, which invention was the subject of a patent to them, number 240,007, under date of April 12, 1881.   In 1888 the Sutton patent in suit was issued, in which was introduced a rotating brush apparatus for the purpose of separating the fur, as will be hereinafter more particularly shown.   Of his invention, Sutton said in the specifications:

"This invention relates to an improved machine for plucking sealskins and other furs, so as to remove the stiff waterhair therefrom without injuring the soft hair or wool of the same.

"The machine is more especially designed with a view to overcome some of the defects and insufficiencies of the plucking-machines heretofore in use, and produce the plucking of the skins at the lower parts of the neck and shoulders, where the hairs point outwardly and backwardly and are the most difficult to pluck, as they lie down close to the skin when the same is drawn over the stretcher-bar.

"My invention is further designed to dispense with a blast-fan or other air-forcing devices, and produce the removing of the water-hairs entirely by mechanical means, which are operated by power, so that a quick and uniform plucking of the skin takes place.

"The invention consists of a machine for plucking seal and other skins, which comprises a fixed stretcher-bar, means for stretching and intermittently feeding the skin over said stretcher-bar, a fixed card above the stretcher-bar near the edge of the same, a rotary separating-brush that is intermittently moved up in front of the stretcher-bar, an oscillating guard below the stretcher-bar, a rotary cutting-knife and a vertically-reciprocating cutting-knife working in conjunction with the rotary knife for cutting off the stiff projecting hairs, said rotary cutting-knife being provided with a card supported back of the knife, all of which parts are operated from a com-

mon driving-shaft, so as to produce for each rotation of the
same the cutting off or plucking of the hairs projecting from
that part of the skin in front of the stretcher-bar."

The invention was illustrated by certain drawings, some of
which are here given, which, together with the description,
illustrate the operation of the machine, so far as necessary for
the purposes of this case.

Fig. 1.

Fig. 2.          Fig. 3.

Referring to the drawings, the inventor says (in part):

"A represents the supporting-frame of my improved machine for plucking seal and other skins. On the frame A is supported a fixed transverse stretcher-bar, B, which is tapered to a narrow edge, over which the skin to be plucked is stretched. The skin is applied by tapes to the rollers $B^1$ $B^1$, which are intermittently actuated by gear-wheels operated by a pawl-and-ratchet-wheel mechanism from the driving-shaft S, as customary in plucking machines of this class. By the gear-wheels and the pawl-and-ratchet mechanism the skin is fed intermittently for a small portion of its length over the front edge of the stretcher-bar, it being unwound from the upper and wound up on the lower feed-roller. Below the edge of the stretcher-bar is arranged a vertically-reciprocating knife C, which moves in slots or ways of fixed guide-plates $C^1$, and which is operated by fulcrumed levers $C^2$, the rear ends of which are engaged by cams $C^3$ on a cam-shaft, $S^1$, that is supported above the driving-shaft S in suitable bearings of the frame A.

"In front of and at some distance from the stretcher-bar B is supported a shaft, $D^1$, in bearings of the frame A, said shaft being provided with radial arms $d$ $d$, to which the rotary knife D is attached, which, in conjunction with the vertically-reciprocating knife C, serves to cut off the water-hairs projecting from that part of the skin in front of the edge of the stretcher-bar B. To the arms of the rotary knife D, and at some distance back of the latter, is applied a carding-brush, $D^2$, which acts on that part of the skin that is fed forward over the edge of the stretcher-bar immediately after the hairs of the next preceding section of the skin have been cut off. The shaft $D^1$ of the cutting-knife D is rotated from the cam-shaft $S^1$, by means of an intermediate longitudinal shaft, $S^2$, and two sets of miter-wheels, $D^3$, $D^4$.

"Immediately above the stretcher-bar B is arranged a stationary card, E, which is attached to the ends of the stretcher-bar B by means of thumb-screws. (Not shown in drawings.)

The points of the teeth of the card E are close to but do not touch the surface of the skin, so that the hair and fur are both straightened as the skin is fed forward. The teeth of the card E hold down the fine fur, but permit the stiff hairs to stand up between the teeth, owing to the slow forward movement of the skin, which gives the hairs sufficient time to so adjust themselves.

"Below the stretcher-bar B is arranged a rotary separating-brush, F, which is supported in oscillating arms $F^1$, that are guided by pins $f$, in arc-shaped slots $f^1$ of fixed guide-plates $f^2$, as shown clearly in Figs. 1, 2, and 3, the oscillating arms $F^1$ being pivoted to horizontally-reciprocating connecting-rods $F^2$, which are provided with yokes $f^3$, having anti-friction rollers at their rear ends and acted upon by cams $F^3$ on the cam-shaft $S^1$, the cams being so shaped and timed that the forward and upward motion of the brush F takes place at the proper time.

"The brush F receives rotary motion from two belts, $f^4$, which pass over pulleys $f^5$ on the shaft $S^1$ and the brush shaft, and which are kept taut by weighted idlers $f^6$, as shown clearly in Fig. 1.

"The brush F is made of soft bristles and is rotated at a speed of one hundred and fifty revolutions per minute. The soft bristles allow the stiff hairs to stand, while the quick motion of the brush bends the soft hair in downward direction and brushes it below the stretcher-bar, so that it can be taken up and held in position by the soft-rubber wipers $g$ of an oscillating guard-bar, G, which moves in arc-shaped slots $g^1$ of the guide-plates $C^1$."

The operation of the machine is thus described:

"The skin is placed in the machine by being attached to the feed-rollers and drawn tightly over the edge of the stretcher-bar, so as to lie close to the upper and lower surface of the same. The skin is put in in such a manner that the head end is foremost. The stiff hairs in sealskins point toward the tail, except at the lower part of the neck and shoulders. These

parts are at the sides of the head end of the skin, as the skin is split open at the under side. At these parts of the skin the hairs point outwardly and backwardly and are the most troublesome to cut or pluck, as they lie down close to the skin when it is drawn over the stretcher-bar. A sharp and quick rub over these parts of the skin from the edge toward the center of the skin is therefore necessary, so as to straighten up the hairs and present them to the action of the cutting-knives. When the skin is in place, the stationary card E is drawn backward a few times over that part of the skin that is upon the stretcher-bar B, so as to card back the fur and hair and produce thereby a parting of the fur at that part of the skin then covering the edge of the stretcher-bar. One-half of the fur upon that section of the skin will by the parting be kept above and the other half below the edge of the stretcher-bar. This permits the hair upon that section of the skin in front of the edge of the stretcher-bar to rise through the fur and keep its place with less trouble than when more fur is acted upon. When the fur and hair have been carded back by the card E, the same is fastened to the stretcher-bar by thumb-screws. The card is set back from the edge of the stretcher-bar to a distance a little more than one-half of the length of the fur for the purpose of holding the fur and preventing it from moving forward until the forward motion of the skin takes place. The card at the back of the rotary knife passes then over the skin in front of the edge of the stretcher-bar and draws out all the fur and hair on that section, so that the fur and hairs so drawn out assume their natural positions—that is, the positions which they would have if the skin were drawn over the edge of the stretcher-bar without anything for holding back the fur and hair. As soon as the card at the back of the rotary knife has passed over the section of the skin in front of the stretcher-bar the rubbers are quickly moved over the same toward the center, whereby the hairs that lie down sidewise are raised and pointed outwardly, causing them to stand upright. The rotary separating-brush is then quickly

moved upward and forward and revolved in front of the skin
at the edge of the stretcher-bar, so as to separate the fur from
the hairs, brushing down the former, and leaving the stiff hair
standing out.  The rotary separating-brush is then quickly
moved backward and downward, so as to carry with it the
separated fur, which is then held in position by the oscillating
guard that follows the brush and carries the fur still farther
back and holds it in position, while the vertical knife is raised
and shears off, in conjunction with the rotary knife, the for-
ward-projecting hairs, as shown in Fig. 1.  The separating-
brush, after it has accomplished its work, is lowered sufficiently
so as not to touch the skin at all, except when it is in front of
the working-edge of the stretcher-bar.  The next section of
the skin is now moved by the feed-rollers over the edge of the
stretcher-bar; and the same operation of the parts produced
by the next rotation of the driving-shaft, and so on until the
skin is finished."

The great merit of this invention is said to consist in the
use of the brush, applied by means of the mechanism shown,
so as to brush down the fur; and permit the long hairs, which
should be removed, and which rise at the edge of the stretcher-
bar, when the pelt is drawn over it to be acted upon by the
knives, when the fur is brushed away, so as not to be injured.

In determining the construction to be given to the claim in
suit, which is alleged to be infringed, it is necessary to have
in mind the nature of this patent, its character as a pioneer
invention or otherwise, and the state of the art at the time
when the invention was made.  It is well settled that a
greater degree of liberality and a wider range of equivalents
are permitted where the patent is of a pioneer character than
when the invention is simply an improvement, may be the
last and successful step, in the art theretofore partially de-
veloped by other inventors in the same field.  Upon this sub-
ject it was said by this court, *Westinghouse* v. *Boyden Power
Brake Co.*, 170 U. S. 537, quoted with approval in *Singer Co.*
v. *Cramer*, 192 U. S. 265:

"To what liberality of construction these claims are entitled depends to a certain extent upon the character of the invention, and whether it is what is termed in ordinary parlance a 'pioneer.' This word, although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. Most conspicuous examples of such patents are: The one to Howe of the sewing machine; to Morse of the electric telegraph; and to Bell of the telephone. The record in this case would indicate that the same honorable appellation might safely be bestowed upon the original air-brake of Westinghouse, and perhaps also upon his automatic brake. In view of the fact that the invention in this case was never put into successful operation, and was to a limited extent anticipated by the Boyden patent of 1883, it is perhaps an unwarrantable extension of the term to speak of it as a 'pioneer,' although the principle involved subsequently and through improvements upon this invention became one of great value to the public."

While it may be admitted that the Sutton patent was a distinct step in the art, and is entitled to protection as a valuable invention, nevertheless it cannot be said to be a pioneer patent in any just sense. In the English Lake patent of 1881, of which more will be said hereafter, there is doubtless a suggestion of the use of brushes for the purpose of separating the fur from the long hair to be removed. And so in the Covert patent of 1884, which was the subject of consideration by Judge Wheeler in the case of *Cimiotti Unhairing Co.* v. *Mischke,* 98 Fed. Rep. 297. In that case it was said that Covert's patent had been mechanically but not commercially successful, and that in lieu of a rotating separating brush, shown in Sutton's patent, Covert used a revolving cloth-covered cylinder, and it was held that this was not equivalent to the separating brush, and Sutton's invention was an advance upon anything

theretofore shown.   Of the Covert patent Judge Cox, in the course of an able opinion sustaining the Sutton patent, *Cimiotti Unhairing Co.* v. *American Machine Co.*, 115 Fed. Rep. 498, 502, said:

"Covert came nearer than any one else to a successful machine.   He had but one more step to take and here he became bewildered and went astray.   He missed the apparently simple arrangement of the rotary brush which alone was necessary.   It will not do to say that the prior art showed such a brush.   Every element of the combination in controversy was unquestionably old, but there was nothing in the prior art to suggest a rotary brush working in the environment shown in the Sutton patent.   There was nowhere a rotary brush making a 'part' on a keen-edged stretcher-bar and brushing the fur down and out of the reach of the cutting-knives during the moment necessary for the removal of the stiff hairs.   It is the presence of this element in the combination which produces a new result and entitles its originator to protection."

In the same case, Judge Wallace (p. 505), in his concurring opinion, says:

"I do not think the machine of the Sutton patent a prodigious advance upon that of the prior Covert patent, and I think a higher degree of merit has been attributed to it than it deserves; but it was enough of an advance to be patentable and to deserve protection against an infringing machine which appropriates it."

Furthermore, it appears that while the Cimiottis acquired an exclusive license under the Sutton patent in 1888, the same was not put into commercial use until the introduction of coney skins as a substitute for sealskins, about the year 1890. During this time the Cimiottis were unhairing a large number of skins and preferred to continue to use the air-blast machine of their own invention while paying tribute to Sutton.   It was the introduction of the coney industry in 1890 that gave stimulus to the use of such mechanisms as those used by the Cimiottis and the respondent in this case.   We think it fair

to say that this record discloses an invention of merit entitled to some range of equivalents in determining the question of infringement, but it is not one of those broad, initiative inventions where original thought has been embodied in a practical mechanism, which the courts have been ever zealous to protect, and to which a wide range of equivalents has been accorded.

Due weight is given to the Sutton patent when it is given credit for dispensing with the plate which Covert had in addition to the brush, and which he supposed would carry down the fur away from the cutting mechanism, but which Sutton has accomplished in giving, in a measure at least, this added function to the brush of not only parting the fur, but carrying it down and away in preparation for the clipping by the knives. Any one who accomplishes the same purpose by substantially the same mechanism, using the elements claimed in Sutton's patent, may be held to be an infringer.

Sutton has taken the step which marks the difference between a successfully operating machine and one which stops short of that point, and that advance entitles him to the protection of a patent.

The argument here is confined, as to the alleged infringement, to the eighth claim of the Sutton patent, which is as follows:

"8. The combination of a fixed stretcher-bar, means for intermittingly feeding the skin over the same, a stationary card above the stretcher-bar, a rotary separating-brush below the same, and mechanism, substantially as described, whereby the rotary brush is moved upward and forward into a position in front of the stretcher-bar, substantially as set forth."

The elements of this claim are five in number: 1, a fixed stretcher-bar; 2, means for intermittently feeding the skin over the same; 3, a stationary card above the stretcher-bar; 4, a rotary separating brush below the same; 5, mechanism whereby the rotary brush is moved upward and forward into a position in front of the stretcher-bar, "substantially as set forth."

In making his claim the inventor is at liberty to choose his own form of expression, and while the courts may construe the same in view of the specifications and the state of the art, they may not add to or detract from the claim. And it is equally true that as the inventor is required to enumerate the elements of his claim, no one is an infringer of a combination claim unless he uses all the elements thereof. *Shepard* v. *Carrigan*, 116 U. S. 593, 597; *Sutter* v. *Robinson*, 119 U. S. 530, 541; *McClain* v. *Ortmayer*, 141 U. S. 419, 425; *Wright* v. *Yuengling*, 155 U. S. 47; *Black Diamond Co.* v. *Excelsior Co.*, 156 U. S. 611, 617; Walker on Patents, § 349. This principle is particularly important when we come to consider the "stationary card above the stretcher-bar," an element of the eighth claim.

The anticipating mechanism set up in this case is the so-called English Lake patent of October, 1881. This patent has been the subject of much adverse comment in the cases involving a consideration of it. And it appears to have lapsed for non-payment of taxes in June, 1885, and not to have been a successful machine. It may be the fact that the patent is not distinctly worded, and that the drawing and specifications are somewhat confused. It does appear, however, without contradiction in the record, that the machine now used by the respondents was made in a large measure from the drawings of the Lake patent. Mischke, one of the respondents, was put upon the stand by the petitioners, and testified that he made the changes in a short time from the Lake patent, which resulted in the alleged infringing machine. The Lake patent showed two brushes, whereas the respondents' machine has dispensed with one and changed the position of the other. He also admits to have changed the position of the cam and shortened the crank arm as shown in the Lake machine. It seems to be the position of the petitioners' expert that Mischke made the changes in the Lake patent necessary to convert it into an operative machine by adopting the controlling features of the Sutton patent. But whatever are the defects of the

Lake patent, the question here is, does the machine of the respondents infringe the eighth claim of the Sutton patent? One of the respondents' machines is in evidence and we have carefully examined it. Its general outline may be seen in the annexed copy of the photograph in evidence:

The operation of the alleged infringing machine is such that when the power is applied for moving the stretcher-bar it is carried forward to the revolving brush, and after the brush has separated the fur from the hair, carried upwardly, to be acted upon by the cutting knives. The reciprocating motion of the stretcher-bar from the brush to the knives is produced by the action of the crank (operating with the cam) on the main shaft, as shown in the photograph At the same time the mechanism for feeding the machine is in operation, actuated by the same application of power. This mechanism (shown in the photograph at the side of the respondents' machine) consists of the pawl (attached to the main frame) and the ratchet-wheel (attached to the moving frame), turning when the pawl engages therein, and acting with the worm gearing shown, to turn the roll which is part of the feeding mechanism. The operation is such that when the stretcher-bar is carried from the knives to the brush in the return motion, the action of the pawl upon the ratchet-wheel, with the worm gearing, causes the roll to turn and the pelt to be carried forward, the extent of the feed being regulated by the adjustment of the pawl. By this means the necessity of an independently acting mechanism for the feeding apparatus is avoided and the operation simplified.

The Sutton device, as we have seen, has a stationary stretcher-bar; the respondents' mechanism has a movable stretcher-bar. The fixed stretcher-bar, about which the other mechanism acts, is made a distinct feature of the eighth claim. It is not present in the respondents' mechanism, unless it is true, as argued, that the one is substantially the equivalent of the other. It is said to make no difference whether the knife and brush are carried to the stretcher-bar or the stretcher-bar is carried to the knife and brush. This might be true if the mechanisms were substantially the same, and there was a mere transposition or substitution of parts. Such changes would amount to an infringement. But in determining infringement we are entitled to look at the practical operation

of the machines. The other elements of the eighth claim are to be used in connection with the apparatus shown in the Sutton patent, substantially as described. If the device of the respondents shows a substantially different mode of operation, even though the result of the operation of the machine remains the same, infringement is avoided. *Brooks* v. *Fiske*, 15 How. 212, 221; *Union Steam Pump Co.* v. *Battle Creek Steam Pump Co.*, 104 Fed. Rep. 337, 343. In the latter case Judge Severens, who delivered the opinion of the court, after recognizing the doctrine that mere change of the location of parts, if the parts still perform the same function, did not take the structure without the bounds of the patent, said:

"If, however, such changes of size, form, or location effect a change in the principle or mode of operation such as breaks up the relation and coöperation of the parts, this results in such a change in the means as displaces the conception of the inventor, and takes the new structure outside of the patent."

And see *Kokomo Fence Machine Co.* v. *Kitselman*, 189 U. S. 8, in which case it was held that where the patent does not embody a primary invention, but only an improvement on the prior art, and the defendant's machines can be differentiated, the charge of infringement is not sustained.

In the case under consideration the respondents have dispensed with the fixed stretcher-bar and have adopted a movable one, operated by an entirely different mechanism, capable of accomplishing a much larger amount of work within a given time. In the Circuit Court of Appeals it was said to result in a double working capacity and product. It does not seem to us to be a mere transposition or substitution of parts; in the Sutton patent, the stretcher-bar being stationary, there are several mechanisms used for operating the movable brushes and the clipping knives; a different mechanism is used for operating the different parts which are to be brought to the fixed stretcher-bar in carrying out the operation intended. In the respondents' machine the same application of power moves the stretcher-bar and, by the coöperation of the feeding ap-

paratus as above outlined, feeds the machine by bringing the pelt forward, at the same time actuating the knives, in practically one operation. This seems to us to be a distinct mechanical departure, as well as an advance upon the Sutton machine, when considered in view of the results accomplished.

Moreover, if infringement could be otherwise sustained, the decree must be affirmed, because the eighth claim has made the stationary card, shown at "E" in the drawing, an essential part of the mechanism described. It may be that this card is unnecessary, and that it was dropped from the later patents issued to Sutton, but it is in this claim, and as was said by Judge Wallace in his dissenting opinion in *Cimiotti Unhairing. Co.* v. *Nearseal Unhairing Co.*, 115 Fed. Rep. 507, 510, "the patent industriously makes the stationary card, substantially as described, an element of the claim." Of this card the inventor said:

"Immediately above the stretcher-bar B is arranged a stationary card, E, which is attached to the ends of the stretcher-bar B by means of thumb-screws. (Not shown in the drawings.) The points of the teeth of the card E are close to but do not touch the surface of the skin, so that the hair and fur are both straightened as the skin is fed forward. The teeth of the card E hold down the fine fur, but permit the stiff hairs to stand up between the teeth, owing to the slow forward movement of the skin, which gives the hairs sufficient time to so adjust themselves."

He also says: "The card is set back from the edge of the stretcher-bar to a distance a little more than one-half of the length of the fur, for the purpose of holding the fur and preventing it from moving forward until the forward motion of the skin takes place."

While it is said that the card does not touch the surface of the skin so that the hair and fur are both straightened as the skin is fed forward, it is true that the teeth of the card in some measure hold down the fine fur, and it is insisted that the mechanical equivalent of this card is found in respondents'

machine in the compression bar, which also acts to hold down the fur before it is carried to the separating brush. But this bar has no carding feature to it, and cannot be made to perform the functions of a card; it has no separate teeth, and is not a card or the mechanical equivalent of one shown and described and made a part of the eighth claim.

We think the Circuit Court of Appeals was right in the conclusion that the mechanism of the respondents was so materially different from the Sutton patent as to avoid the infringement alleged; and that an essential element of the eighth claim of the Sutton patent was not used by the respondents.

*Decree affirmed.*