PORTLAND GOLD MINING CO. v. HERMANN.

(Circuit Court of Appeals, Eighth Circuit. January 13, 1908.)

No. 2,539.

1. PATENTS—ACTION FOR INFRINGEMENT—PLEADING.

The petition in an action at law for infringement of a patent *held* not insufficient as counting on the recovery of profits instead of damages.

2. SAME—INFRINGEMENT—COMBINATION OF OLD ELEMENTS.

A patent for a combination of well-known mechanical appliances is limited to the combined apparatus as specified, and no great liberality in applying the doctrine of mechanical equivalents can be indulged in its favor, and no one is an infringer unless he uses all of the elements claimed in substantially the same mode of operation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 382–389.]

3. SAME—APPARATUS FOR SCREENING, WASHING AND ASSORTING ORES.

The Hermann patent, No. 719,942, for apparatus for screening, washing, and assorting ore, claim 4, construed, and *held* not infringed.

In Error to the Circuit Court of the United States for the District of Colorado.

Horace N. Hawkins and A. J. O'Brien (Edmund F. Richardson and W. J. Chinn, on the brief), for plaintiff in error.

William O'Brien, for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The defendant in error (hereinafter designated the plaintiff) sued the plaintiff in error (hereinafter designated the defendant), a mining corporation, for damages for the infringement of letters patent, No. 719,942, issued February 3, 1903, entitled "Apparatus for Screening, Washing, and Assorting Ores." On trial to a jury the issues were found for the plaintiff on the fourth claim of the patent, and the damages were assessed at $1.

The first insistence of defendant is that the petition counts on damages for profits, which are not recoverable in an action at law, as declared by this court in the recent case of Brown v. Lanyon, 148 Fed. 838, 78 C. C. A. 528. The only basis for the contention, put forth for the first time on this writ of error, that the petition is for an accounting of profits, is the concluding paragraph of the petition that:

"The defendant * * * has continued and persisted in continuing * * * to use said machine and improvement so patented, to the damage to the plaintiff in the sum of fifty thousand dollars. That the profit to the defendant from the said use of said machine and the value to it of the use thereof has been not less than the sum of fifty thousand dollars. Wherefore, the plaintiff prays judgment against the defendant for the said sum of fifty thousand dollars, together with the costs."

The argument is that as damages for the use are alleged to be $50,000, and the profits of the defendant therefor are $50,000, the prayer for judgment covers the profits as well as the damages for the invasion. It is quite apparent, however, that the double statement

of the $50,000 sued for resulted rather from the pleader confounding the damages in such action with the claim for profits as synonymous. The case presented throughout the averring portion of the petition is for damages at law arising from the infringement of the plaintiff's exclusive right to the use of his patented device. Relief can be administered in lawsuits only in accordance with the facts set out in the pleading, regardless of the prayer. As the profits are based upon the existence of .established royalties, involving matters of accounting cognizable in equity, the bill should be framed accordingly, containing the essential averments authorizing an inquiry for the ascertainment of profits. There are no facts alleged in the petition as a basis for the ascertainment of profits. While at one time in the progress of the trial plaintiff's counsel sought to raise, by questioning a witness, an issue respecting royalties, it was cut off by the court on objection. As the patent was comparatively new when this suit was brought, there was no established business as a basis for other than nominal damages.

Turning to the question of infringement, the claim of the plaintiff rests upon a combination patent—the combining of anterior, independent devices in such new form of arrangement as to possess the quality of novelty and usefulness. The statute itself provides that things to be patented must be invented things, as well as new and useful things. Thompson v. Boisselier, 114 U. S. 11, 5 Sup. Ct. 1042, 29 L. Ed. 76; Gardner v. Herz, 118 U. S. 191, 6 Sup. Ct. 1027, 30 L. Ed. 158.

The material specifications for this patent are substantially as follows: The invention relates to improvements in apparatus for screening and washing ore .preparatory to sorting, including means for separating the dry from the wet screenings, together with apparatus for drying the latter. That the ore when taken from the mine is coated with fine material adhering thereto during the operation of mining and hoisting, which contains values, adhering to the worthless rock as well as to the rich ore. To avoid the waste of the valuable material thus adhering to the worthless rock and to remove the coating of fine material from the ore in order that it may be intelligently sorted, is the object of the screening and washing operation described in the specification.

The drawing accompanying the application is here presented.

It is an orehouse, with two inclined chutes at the top, the extremities of which unite to form an apex at the track upon which the loaded ore cars are run from the mine; the chutes being so arranged that the ore may be discharged from the cars on opposite sides. The upper portion of each chute, upon which the ore is first discharged, consists of a grizzly, composed of flat bars, the space between the bars increasing in width from the top downwardly. Underneath these bars is located a screen in the usual manner. The fine material which passes through the screen is in a dry state and falls into a bin underneath, thence into a hopper, and finally into a car below. Below the screen, and forming a continuation of the inclined chute, is a perforated plate, plain or stepped, the latter being preferred since it causes

the ore to roll over a number of times on its way down, better exposing it to the action of the water. This construction permits of locating a perforated pipe below each step, but protected from the falling ore. These pipes discharge jets of water on the ore as it falls, and facilitates the operation of washing the ore clean for the purpose stated. Above the stepped perforated plate and mounted on the sides of the chute are perforated water pipes, arranged in any suitable manner to discharge jets of water on the ore as it passes downwardly over the perforated plate. The fine material washed from the ore passes through

the perforated plate into settling tanks, from which it may be removed to a drying tank, adjacent to the bin and communicating therewith by an opening normally closed by a hinged door which may be opened for the purpose of throwing the dry ore into the hopper. Furnaces (19) may be constructed underneath the tank (16) for the purpose of drying the ore. From the fire boxes of these furnaces hot air flues pass underneath the tanks (16 and 17), their inner extremities communicating with upright pipes (21), forming stacks for the escape of the products of combustion. Beneath this fire box is located an ash-chute (22). Steam pipes or any other suitable drying apparatus may be employed. At the lower extremity of the perforated plate (13) are located the ore assorting tables (23). In practice, a person stands on each side of the tables and sorts the ore, dropping it into a hole in the floor. Hence it passes to a hopper and finally into cars. The worthless rock passes from these tables into cars.

At the trial, either by the action of the plaintiff or the ruling of the court, the cause was submitted to the jury alone upon the fourth claim of the patent, which is as follows:

"4. In apparatus of the class described, the combination with a suitable supporting structure, of a grizzly located at the top, an inclined perforated plate forming a continuation of the grizzly, an ore assorting table at the lower extremity of the said plate, means for spraying water upon the ore as it passes downwardly over the perforated plate to the table, suitable bins below for receiving the dry and wet screenings, and means for drying the latter, substantially as described."

Reduced to its essence, this claim is a combination with a suitable supporting structure of a grizzly located at the top, an inclined perforated plate forming a continuation of the grizzly, that is, on which the grizzly discharges. The claim, it will be noticed, does not mention a screen underneath the grizzly; but under the grizzly is a perforated plate forming a continuation of the grizzly; an ore-assorting table at the lower extremity of said plate; means for spraying water on the ore as it passes downwardly over the plate to the table, the pipes being perforated so as to spray inwardly over the material as it passes on. The next element of the combination is suitable bins below for receiving the wet and dry screenings, and means for drying the latter—that is, the wet screenings—substantially as described. A kind of furnace, marked "20," is located under the bins (16 and 17). The specification states that steam pipes may be used in this drying process, although no pipes are shown in the drawing. They, however, would be mere mechanical equivalents. In his testimony the plaintiff disclaimed any invention respecting the grizzlies employed in his device. He said "it is as old as the hills." This appliance for an allied purpose was clearly anticipated by the Thomas patent, No. 109,969, granted December 6, 1870; as in the patent No. 38,569, granted May 19, 1863.

The second element is a screen underneath the grizzly, inclined in the same direction—that is to say, a grizzly discharging ore over its lower end onto a screen further down the slope—and is substantially found in patent No. 639,710, granted to Cherry, December 26, 1899. What is called the "wet grizzly," having a spraying apparatus over

it discharging a spray upon the ore as it goes down, has its mechanical equivalent, in substantial operation and effect, in the Bacon patent, No. 375,673, granted February 9, 1886, used for washing phosphate rock. This patent shows a series of parallel inclined bars, in construction the same in effect as a grizzly, on which the phosphate rock was thrown for the purpose of washing while moving down the incline. The spraying apparatus consists of pipes arranged from the sides of the screen and also across so that the water discharges on four sides on the screen and rock as the latter moves down the inclined bars, substantially in the same way as it is discharged in the plaintiff's patent. About the only difference is the material acted upon, one being ore rock and the other phosphate rock; but the function is the same, and the principle is the same. With some modification, but in substantial form, the elements of the wet screen are found in the Donner patent, No. 366,820, granted July 19, 1887. The only difference is that in the Donner machine the screen and spray are arranged in series, one above another, to more perfectly perform the washing function.

The next element of this claim is "an ore-assorting table at the lower extremity of the said plate"—that is, where the ore empties or falls after the spraying process.

The last element is "suitable bins below for receiving the dry and wet screenings, and means for drying the latter, substantially as described."

In its final analysis the testimony of the plaintiff shows that his chief, if not his only, claim to exclusive use rests upon "means for spraying water upon the ore as it passes downwardly over the perforated plate to the table,"—that is to the assorting table. He states in respect of this improvement, in his application and specification, that it is "to avoid waste of the valuable material adhering to the worthless rock and to remove the coating of fine material from the ore in order that it may be intelligently sorted, is the object of the screening and washing operation" described; whereby he makes a valuable saving to the mine operator. No invention can be predicated independently of this washing apparatus as such. The publication of August 18, 1889, entitled "The Colliery Guardian and Journal of the Coal and Iron Trades," on file in the Patent Office at Washington, presents an apparatus for the mechanical separation of valuable ores, which is the mechanical equivalent of the plaintiff's device in this respect. This is an apparatus used in Sweden long anterior to the use in the Cripple Creek district. It presents chutes inclining both ways downwardly for the cars to dump the rock, placed upon inclined screens of different perforations, different fineness; there are pipes and screens located above them across the screens, and the rock dumped upon this inclined screen moved downward and is washed by the spraying. The slimes go into the bin, and they are discharged into some receptacle underneath, substantially in the same manner as in the plaintiff's device. There was also the Watkins patent, granted July 16, 1901, on an application filed August 27, 1900, No. 678,819. This patent discloses a series of parallel inclined bars for receiving the ore moving down over the inclined bars. Underneath the series of parallel bars in the

nature of a grizzly were screens inclined downwardly in substantially the same direction as the bars are inclined, and they are below the screen. The patentee in his specification in that case said: "I provide on the front of the hopper a U-shaped keeper for support of a hose, that may be used for delivering water upon the material on the riddle;" the cross-bar and U-shaped holder in which the hose may be made to rest while it discharges water over the riddle—that is, he calls the bars a riddle. This unquestionably is a wet screen and grizzly with means for discharging water over the bars or grizzly, and washing the ore as it comes down. It is entitled:

"An apparatus for treating sand and other placer materials as well as artificially pulverized ore, and separating therefrom the gold or other precious metals contained therein. It is particularly adapted for treating such material in large quantity and with great rapidity."

The patentee says, after he designates the parallel inclined bars as riddle, it is sometimes called a grizzly in the ore-producing Western states.

The ordeal through which the plaintiff's application for a patent passed, as disclosed by the file wrapper and contents in the Patent Office, discloses how exceedingly narrow is the footing on which this patent rests. The application was made in December, 1901. The fourth claim as therein expressed was as follows:

"In means for screening and washing ore, the combination of an inclined chute having a perforated bottom, and side pieces, and perforated water pipes mounted on the side pieces and arranged to spray water upon the ore as it passes down the chute, substantially as described."

This claim was rejected in February, 1902. The Examiner of Patents stated:

"Claim 4 is misstated, as the sides of the chute are not perforated. However, the claim is rejected upon either Bacon or Donner, cited, as there would be no invention in the mere transposition of the spray-pipes from the main frame to the chute-frame."

In March, 1902, the claimant amended his fourth claim as follows:

"In means for screening and washing ore, the combination of an inclined chute having side pieces, and a perforated bottom, perforated water pipes mounted on the side pieces and arranged to spray water upon the ore as it passes down the chute, and an ore-assorting table at the lower extremity of the chute, substantially as described."

This was again rejected in May, 1902, the Examiner stating:

"Claim 4 is rejected on Bacon, cited, as involving nothing more than an arbitrary arrangement of the water pipes having no functional significance."

In June, 1902, the applicant again amended this claim as follows:

"In means for screening and washing ore, the combination of a grizzly, a screen of suitable mesh located underneath the grizzly and inclined in the same direction as the latter, an inclined trough or chute located below the screen and forming a continuation thereof, suitable means located above the perforated plate for discharging water upon the ore as it passes downward thereon, and suitable receptacles located below the screen and the perforated plate for receiving the dry and wet screenings, substantially as described."

In August, 1902, the Examiner replied that the first claim was utterly destitute of patentable novelty in view of Bacon and Watkins, of record, and it was therefore rejected.

"There is no invention in aggregating Bacon's spraying devices with Watkins' separator. * * * The terms 'inclined trough,' line 4, claim 4, is not understood, there being no inclined trough shown or described. However, the claim is rejected in view of Bacon and Watkins, above cited. it being for the mere aggregation of Bacon's spraying mechanism with Watkins' washer and separator."

The claimant responded to this in September, 1902, in which he insisted that his amended claims were believed to be allowable, calling attention to the fact that in the patents of record:

"No provision is made for keeping a portion of the fine material as it leaves the ore or rock in a dry state. It will be understood that when the ore is discharged upon the grizzly, a portion of the finer material which adheres to it may be removed in a dry state without the assistance of water. Applicant's construction makes provision for keeping this portion separated from the wet portion, whereby the expense of drying a certain portion of the screenings is avoided."

In view of our concurrence on the question as to whether the apparatus employed by the defendant constitutes an infringement of the plaintiff's patented combination device, we pass, without expressing an opinion upon the validity of the patent, to the consideration of the question of infringement.

The defendant employed in its structure a single inclined chute or grizzly "as old as the hills" at the top of the structure into which the ore as it comes from the mine in cars is dumped. In passing over this stereotyped grizzly the finer loose particles of ore pass through the bars of the grizzly into the screen beneath, through which the valuable dusty particles are sifted to the bin or floor below, where it is collected and sacked, without further process, for shipment. This was an old process and an old result. The ore rock passes off the dry grizzly, first onto the assorting tables, suitably arranged at the lower outlet of the grizzly, where it is taken in hand by sorters, who, according to the evidence, were from 14 to 28 in number, and by manipulation and hammering the richer ore is separated, and thrown into chutes, passing to the bin beneath, from which it is shipped. This part of the ore thus manually separated at the assorting tables never passes through the washing apparatus. The remaining rock is by the hands of the sorters thrown into the chute carrying it through the wet grizzly, where it is sprayed by application of the water, which may be the mechanical equivalent of the apparatus so employed by the plaintiff. The slimes thus washed off pass down through the screen into the bins beneath, from which they are carried by wheelbarrows to the drying bins some 20 or 30 feet distant. The rock thus washed does not pass onto any assorting tables for assortment, but it passes to the ground beneath, from which it is carried by a revolving belt up an elevator to hand cars and thence to the dump.

There is a sharp conflict in the testimony as to whether the defendant copied from the first prints made by the plaintiff of his device, or whether the plaintiff did not get his plan from the blue print gotten

out by the defendant's employés. But as this was a question for the jury we need not discuss the proofs. The evidence shows that the defendant used for only about three weeks the inclined perforated plate claimed by the plaintiff, as it proved to be troublesome in buckling up and soon wore out. It substituted therefor grizzly bars. The assorting tables as employed by the defendant had long been in use by it for such purpose. The first marked difference in the defendant's device from that of the plaintiff is both in the position and office of the assorting tables. In the plaintiff's specification the ore-assorting table is at "the lower extremity of the said plate," that is at the end of the wet grizzly, so that the ore rock passed continuously and automatically from the top of the ore chute over the dry grizzly onto the inclined perforated plate, through the washer, to the assorting table, where the worthless rock passed on through the chute to the dumping car. As stated in the specification of plaintiff's patent, the purpose of having the ore-assorting table in the position stated was that after the washing process "the ore may be intelligently sorted," whereas in the defendant's device the ore-assorting table was at the end of the dry grizzly, where its continuous descent was arrested after the loose material was shaken therefrom in the falling process and passed into the dry bins, and the ore rock, before any washing process, was taken in hand by sorters, manipulated, broken with hammers, the valuable ore thus separated and passed into the dry bins, and only the remaining rock passed through the washing apparatus.

Another difference in the arrangement and process, as specified in claim 4, is the means for drying the wet screenings, stated in claim 4 to be, "the means for drying the latter, substantially as described." The description as given in the preceding specification and accompanying diagram is:

"Furnaces (19) may be constructed underneath the tank (16)—that is, the tank where the wet screenings fell—for the purpose of drying the ore. From the fire-boxes of these furnaces hot air flues (20) pass underneath the tanks (16 and 17), their inner extremities communicating with upright pipes (21), forming stacks for the escape of the products of combustion. Beneath each fire-box (19a) is located a downwardly-inclined ash-chute (22). It is evident that steam-pipes or any other suitable drying apparatus may be employed."

Notwithstanding the technical quibbling of plaintiff's counsel that this specification does not necessarily limit the drying furnace in the place below the screens so as to connect automatically or immediately, it must be conceded that the descriptive words "substantially as described" mean the furnace or its mechanical equivalent shown by Figs. 19 and 20 in the drawing. It does not refer to drying appliances located anywhere, at any place, or any distance. If so, as pertinently suggested by the expert witness Gen. Speer, it might be made to mean drying by the sun or the wind, which would hardly constitute a mechanical appliance. Its reasonable import is artificial drying, by heat, and confined to the thing represented in the specification as a furnace, or by steam pipes located under the bin for receiving the screenings. In the defendant's device the wet slimes were carried in wheelbarrows to the drying bins, from 20 to 30 paces distant, to the receptacle where they were deposited.

In a combination device consisting in congeries of well-known mechanical appliances, no liberality of construction is accorded to it to create a monopoly; but it is limited to the descriptive elements in the combination as expressed in the specifications; and no great liberality of the doctrine of mechanical equivalents can be indulged in its favor. As the applicant for such combination of old devices chooses his own expressions in presenting it, and is required to enumerate the elements of his claim, he is limited to the combined apparatus as specified. And no one is an infringer of a combination claim unless he uses the elements thereof, and in substantially the same mode of co-operation. In Cimiotti Unhairing Company v. American Fur Refining Company, 198 U. S. 399, 410, 25 Sup. Ct. 697, 702 (49 L. Ed. 1100), the court said:

"In making his claim the inventor is at liberty to choose his own form of expression, and while the courts may construe the same in view of the specifications and the state of the art, they may not add to or detract from the claim. And it is equally true that, as the inventor is required to enumerate the elements of his claim, no one is an infringer of a combination claim unless he uses all the elements thereof."

Again the court said, page 414 of 198 U. S., page 702 of 25 Sup. Ct. (49 L. Ed. 1100):

"The other elements of the eighth claim are to be used in connection with the apparatus shown in the Sutton patent, substantially as described. If the device of the respondent's shows a substantially different mode of operation, even though the result of the operation of the machine remains the same, infringment is avoided."

A combination is not infringed unless all its elements as they are claimed are used, whether they are essential or not. Royer v. Schultz Belting Company (C. C.) 28 Fed. 850; Snow v. Lake Shore & M. S. Railway Company (C. C.) 18 Fed. 602. The governing principles applicable to a mere combination patent, like the plaintiff's, without any invention as to any one of its elemental parts, are very aptly stated by Robinson on Patents, vol. 1, p. 228:

"A combination is a union of elemental means in a mode of co-operation; and, as such, it necessarily performs functions into which all its elements enter as operative agents, and produces results which depend upon the presence and action of every one of the elements combined. * * * The identity of a combination depends upon that of its elemental means and that of the co-operative law under which its elements are united; any substantial change in either means of law destroying its identity and resulting in the final segregation of the elements or in a new and wholly different combination. * * * A patented combination is the combination described and claimed in the patent; i. e., it is composed of the described elements coacting under the described co-operative law, whether or not such description correctly enumerates the true elements or sets forth the real mode of their co-operation."

In paragraph 922 he sums up the rule as follows:

"A combination is a group of instruments or operations united under a co-operative law. Its identity depends upon the presence in the combination of each one of these elements or its equivalent, and upon their co-operation in this specific manner to produce the ultimate result. Hence any change in the number of its elements, or in their essential character, or in their mode of co-operation, is a departure from the substance of the combination, and constitutes a different invention. A patented combination is the combination de-

scribed and claimed in the patent which protects it. Of whatever elements it may actually be composed and whatever may be the method of their union as the inventor conceived and practices his invention, the elements specified in the patent, and the co-operative law there described, are those which characterize the patented combination and form the subject of the exclusive privileges of the patentee. The infringement of a combination patent, therefore, consists in the manufacture, use, or sale of any combination in which precisely the same elements or their equivalents are united under the same co-operative law. To make or use or sell a combination in which the same elements are differently combined, or a combination which comprises only a portion of these elements, though the discarded elements are practically useless, and though the combination thus created was suggested by the former, is not an infringement."

The application of these recognized principles demonstrates that the defendant's apparatus was no infringement of the combination apparatus for which the plaintiff obtained his patent right. The ore as it is emptied from the delivery cars at the top of the chute onto the dry grizzly, in the defendant's apparatus, does not descend continuously and automatically over the dry grizzly onto the wet grizzly through the washing apparatus and onto the ore-assorting tables at the bottom of the wet grizzly. The descent by gravity in the defendant's apparatus is arrested at the end of the dry grizzly, where it passes out onto the assorting tables, and the sorting by hand takes place before any application of water to the ore, and only a part of the rock left after the manual separation of the richer parts at the ore assorting tables passes onto the wet grizzly to be washed. There are no ore assorting tables at the lower extremity of the washer plate, and no assorting, in fact, is done there. This differentiation brings the case clearly within the ruling in American Chocolate Machinery Company v. Helmstetter, 142 Fed. 978, 74 C. C. A. 240. The Holmes patent in that case was for a machine for coating confectionery, claim 1 covering "the combination with the drop dipping mechanism, of a jarring device for removing surplus coating material from the drops." It was held that this combination was not infringed by a machine in which the dipping and jarring devices are merely aggregated, the jarring operation being performed after the dipping has been completed, and the tray containing the drops removed to another frame. The court laid down the following rule:

"To constitute a combination it is essential that there should be some joint operation performed by its elements, producing a result due to their joint and co-operating action, while in an aggregation there is a mere adding together of separate contributions, each operating independently of the other."

It was held that the defendant's machine was merely an aggregation of two devices, not acting together automatically, but there was an interposition by handling after the dipping process was gone through with, and the jarring process was independent of that. The court said:

"There is no mechanical or functional mutuality of operation. It is not a combination because there is no co-operation between the coating and jarring mechanisms, because the two devices do not unitedly perform their functions, and because they are not necessarily combined in one machine, and do not act together to secure the final result."

Quoting from Beecher Manufacturing Company v. Atwater Manufacturing Company, 114 U. S. 523, 5 Sup. Ct. 1007, 29 L. Ed. 232:

"Each pair was used by itself, and might be so used at any distance of time or place from the other; and if the two were used at the same place and in immediate succession of time, the result of the action of each was separate and distinct, and was in no way influenced or affected by the action of the other. This was no combination that would sustain a patent."

The principle of this case was recognized in this circuit in the case of Dunlap v. Willbrandt Surgical Manufacturing Company, 151 Fed. 223, 80 C. C. A. 575. The patent in that case covered an atomizer. The principal feature of the claim in question was that the tube which entered the bottle was made in three separate parts, to facilitate cleansing. One of the parts was a hollow coupling uniting the other two. It was held that it was not entitled to a broad construction, but was limited by the prior art and the language of the specification; that each of the three parts of the tube described was an essential element of the claim, and it was not infringed by a structure in which the tube was made in two parts directly joined together. The court said:

"In the defendants' device two of the complainant's elements are lacking, namely, the hollow coupling and the side opening in the hollow coupling registering with a similar opening in the lower tube member. The complainant calls his device a 'two-part spraying tube with a hollow coupling,' but it is really composed of three. * * * From the standpoint of the patent, the division of the tube into three separate parts is not a mere unnecessary detail of construction that may be dispensed with by the complainant. It is put forward as an important and emphasized feature, and is called for by the declared purpose of his structure. * * * Of course, there are cases in which, in determining whether a subsequent device infringes, it is unimportant whether it is made in two pieces instead of three, or whether a member is mechanically attached to the remainder of the structure or is made integral with it. * * * They are, however, inapplicable to a case in which the very divisibility into parts or in which the particular method of attachment constitutes the law of the structure or is declared or appears to be of the essence of the supposed invention."

The court further said:

"A patentee is entitled to every function his device will perform, though he was ignorant of it when he procured his patent. But he secures no patent on the function, and a discovery of a new one in a patented device does not operate to enlarge or broaden the letter of his claim. It is the claim which measures the rights of the patentee, and that which is not claimed is, so far as the particular patent is concerned, dedicated to the public. There is nothing in the patent here which entitles the complainant to any novel or particular arrangement of the air and liquid passages; and, if it can be said that the claim covers a new arrangement of the discharge openings as distinguished from the air and liquid passages, it must be answered that it was expressly claimed in connection with a hollow coupling which he made indispensable and which is not found in defendant's structure, and that the very narrow character of the complainant's advance over the prior art does not authorize the broad construction for which he contends."

In Mallon v. Gregg & Company, 137 Fed. 68, 79, 69 C. C. A. 48, this court, speaking of the fact that the fourth claim there alleged to have been infringed disclosed that the combination of boxes pivotally supported on a shaft, stretcher-rods having a longitudinally-adjustable

connection with said pivotal boxes, and cross-bars carried by chains and provided with rake-teeth, said that the machine of the defendant had neither cross-bars provided with rake-teeth upon its endless chain, nor stretcher-rods longitudinally adjustable in pivotal boxes; and that "since at least one element of each of the combinations secured by the claims upon which this suit is founded is wanting in the machines of the defendants, they cannot be held to infringe these claims. * * * The absence from a device that is alleged to infringe a patented combination of a single mechanical element of that combination is fatal to the claim of infringement."

It must be admitted that the Portland structure and device could not be patented. The application for a patent therefor would have encountered the same obstacles that the evidence in this case shows Hermann had to contend with before he got his claim through the Patent Office. On account of the position of the assorting table, rendering the operation of the dry grizzly entirely independent, and the operation of the wet grizzly entirely independent of both, the co-operative unity is entirely wanting in the combination device of the defendant, and therefore could not have been patented. The necessary corollary is that the one device is not an infringement of the other.

Impressed, as plaintiff's counsel throughout the hearing of this case was, with the position and office of the assorting table in the defendant's apparatus, so entirely different from that of the plaintiff's, he sought to escape from the dilemma by most inconsistent and indefensible positions. The trial court in its charge to the jury felt compelled to say that the defendant's assorting table could not be found, as in the fourth claim of the plaintiff's patent, at the lower extremity of said plate, but left it to the jury to say whether or not it was a mere transposition of position, being mere mechanical equivalents. This was not even sought to be defended by plaintiff's counsel in argument; but his first contention was that the revolving belt at the bottom of defendant's structure, which conveyed the worthless rock up through the elevator to the dumping car, was itself an assorting apparatus. This contention was unsupported by any tangible evidence. The evidence is that the rock rejected at the assorting tables in the early operations passed through the chute to where the dumping car stood, which carried it off to the dump pile. The dump pile becoming so high as not to permit the cars to be so operated, they were run on top of the dump and a belt apparatus and elevator were constructed for the sole purpose of lifting the refuse rock to where the car stood. This belt operated on an inclined plane, from an elevation of from 3 to 7 feet high, where it connected with the elevator. It revolved at the rate of about 100 revolutions per minute. The elevator shaft through which the rock was conveyed was perhaps 100 feet high. The evidence further shows that its structure of leather was wholly unsuited to the function of an assorting table. As such, it would not admit of hammering of the rock, and the revolution was so rapid as to absolutely prevent such selection as an assorting table is designed to accomplish. It was inclosed with a covering, without light to permit of such use by the men stationed along it. The contention of plaintiff is predicated largely of the fact that men would be stationed along the elevator shaft, on

the lookout, and when they discovered what they conceived to be a piece of rock containing valuable ore would snatch it off and throw it to one side. With equal propriety could it be said that if after the rock was dumped from the elevator into the dumping cars a piece of rock supposed to contain valuable ore should be taken out before it was carried to the dump, the dumping car was the equivalent of the assorting table described in the plaintiff's patent.

As a dernier ressort, suggestion was made by one of plaintiff's counsel that the mere spout or plate at the end of the chute through which the rock fell from the wet grizzly might be regarded as an assorting table. This is not even plausible.

The request by defendant for an instructed verdict should have been given. The judgment of the Circuit Court is therefore reversed, and the cause remanded with directions to grant a new trial, and for further proceedings in conformity with this opinion.