### P. GOLDSMITH CO. v. JOHNSTONE.

### SPINNEY v. SAME.

(Circuit Court of Appeals, Sixth Circuit. January 14, 1924.)

#### Nos. 3996–3997.

1. Patents ⬅️328—Johnstone, No. 1,449,183, for baseball mask, held valid and infringed.

The Johnstone patent, No. 1,449,183, for a baseball mask, *held* valid and infringed.

2. Patents ⬅️178—Call for "integral" part not limited to one structurally integral.

A call in a claim for a "one-piece integral" part is not in this case to be construed as an intentional limitation to one structurally integral, as distinguished from one made integral by the permanent holding together of the parts and their integral operation or function.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Integral.]

Appeal from the District Court of the United States for the Southern District of Ohio; Smith Hickenlooper, Judge.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suits in equity by James E. Johnstone against the P. Goldsmith Company and against John A. Spinney. Decrees for complainant, and defendants appeal. Affirmed.

Walter F. Murray, of Cincinnati, Ohio, for appellants.

Albert F. Nathan, of Newark, N. J., and Wm. R. Wood, of Cincinnati, Ohio, for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. These cases were heard together in the District Court and argued together here. In each the suit is for infringement of United States patent to Johnstone, No. 1,449,183, March 20, 1923; the Goldsmith Company being the manufacturer and Spinney the seller of the alleged infringing device. The defenses challenge both validity of the patent and infringement. The appeal in each case is from an interlocutory decree finding the patent valid and infringed.

[1] The patent relates to baseball masks designed to be worn by catchers and umpires. Prior to Johnstone the masks were always made of interlaced wires (sometimes bound with wires at their crossings), soldered (latterly electrically welded) at the intersections. In the use of wire masks many injuries had been suffered, due to the breaking or bending of the wires. While the electrically welded masks were apparently better than their predecessors, some of the injuries were said to have occurred in their use. Johnstone, who was a metal molder, and who had been for many years a baseball umpire, conceived the idea of getting rid of the wire mask. In 1921 he developed the mask of the patent, whose object was "to provide a mask of a lighter, more reliable, and more rugged construction than those heretofore available." He proposed to accomplish this through the use of "a one-piece integral visor in the nature of a thin shell of very light weight yet malleable metal of a nature capable of being formed by a single casting operation."

The patent discloses a one-piece shell semi-ellipsoidal in shape, "made by a casting operation of a suitable light weight alloy of a nonbrittle character," conforming generally to the contour of the face, and embracing a crown, ear wings, and chin guard, the face being otherwise protected by two widely separated, narrow, elongated, and outwardly bulged bars, extending in parallelism across the face, sufficiently far apart to give the greatest amount of visability consistent with strength, and sufficiently near together to prevent the ball coming into contact with the face. There are thus provided three substantial openings— a crown (or forehead) opening [1] and two lower openings extending transversely entirely across the face, the upper opening permitting visibility, not only directly in front, but downwardly, and (in connection with the crown opening) upwardly as well, the lower opening is called a "spitter" opening. Naturally, the interior of the frame con-

---

[1] The patent drawing shows two crown openings, separated by a vertical strip of the integral frame casting. In the model adopted before application for patent, as well as in subsequent manufacture, this vertical strip is cut away.

tacting with the face and head of the wearer was protected by pad-ding. The bulging of the transverse bars prevented their coming in contact with the face. The exterior of the metal frame was un-padded. In the first model this bars were flat, but in July, 1921 (the month in which—but perhaps after—application for patent was made), the lower bar was made rounded, and in September, 1921 (and ever since) both bars were made of that shape. The result was a mask ap-preciably lighter and much stronger than the wire mask of the prior art, and allowing much greater visibility. It is the undisputed testi-mony, not only that no injury to the wearer of the Johnstone mask has ever occurred, but that breaking or bending of the mask, either by baseball or bat, is impossible. The mask was put upon the market in September, 1921, never since having been changed, except in respect to sizes. The claims are printed in the margin of this opinion.[2]

We think the Johnstone disclosure plainly involves invention. The sales manager of the wholesale sporting goods firm of A. G. Spalding & Bros., which put out the mask in 1921, said that "it was the most radical thing that we had ever seen in the line of a mask," and that "we have never had anything that was taken up quite as fast as this mask was by the players, particularly the professional ball players of the country." Goldsmith himself pays equally significant tribute. In April, 1922, upon seeing one of Johnstone's masks, he inquired of the representative of a dealer handling it whether it was patented, with the statement that, if it were not, his firm would like to take up the question of manufacturing it. The idea was abandoned apparently because of the reply that the mask was patented.[3] Goldsmith later copied the Johnstone mask in every particular, save that flat, steel bars, inserted under tension within slots in the edges of the metal frame,

[2] "1. A visor for baseball masks, comprising a one-piece shell semi-ellip-soidal in shape and having two narrow elongated outwardly bulged bars ar-ranged in parallelism to form an enlarged eye slit extending without obstruc-tion from one side to the other side of the mask and isolated ventilating ports located above and below said eye slit."

"2. A baseball mask, combining a one-piece integral visor having a crown and rearwardly extending ear wings and a chin guard and two widely separat-ed, narrow, elongated, outwardly bulged bars, extending in parallelism to form with said chin guard two isolated, elongated apertures extending hori-zontally across the face of the mask without interruption for the mouth and eyes, a marginal pad, and a retaining harness attached to the crown and the ear wings."

"3. A one-piece integral visor for baseball masks, having its crown aper-tured for ventilation, and having an enlarged face-opening subdivided only by a single, narrow, transverse nose-protecting bridge extending horizontally, to provide a substantially unobstructed vision to the wearer."

"4. A baseball mask, comprising a one-piece integral visor in the nature of a metallic shell having a single, narrow, transverse nose arch devoid of vertical extensions, said visor providing rearwardly and outwardly extending ear guards and an inturned chin guard, the brow portion and chin piece hav-ing ventilating apertures, a marginal pad, and a retaining harness secured to the brow and the ear guards of said visor."

[3] This information was incorrect. Patent, however, had been applied for, and the manufactured articles were so marked. Goldsmith seems to have been impressed by the feature of the Johnstone mask which he refers to as "doing away entirely with the electric welded, wire frame mask."

were substituted in place of Johnstone's rounded bars, cast integral with the frame.

Goldmith's catalogue, issued January 1, 1923, while the Johnstone application was pending, and before Goldsmith had applied for a patent, speaks of his model of mask as "a radical departure in the construction of catcher's masks," says that it has been "adopted by many of the prominent catchers in the big leagues," "that its construction insures absolute protection, and permits freer and more unobstructed vision than has heretofore been obtainable," and describes the frame as "a solid one-piece aluminum casting, unbreakable, yet lighter in weight than the regular professional steel wire mask." Johnstone, who testified in July, 1923, stated that thousands of the masks were on the market and already sold. He not only gives a list of prominent players using his mask, but adds that every catcher and umpire in the last two world's series used his baseball mask. By way of illustration of the advantage of the Johnstone mask, a league semi-professional umpire testified that, due to the absence of wires obstructing his view, and the lack of fear of injury, he had become "a 100 per cent. better umpire" than when using a wire mask. The force of the favor with which the mask was received by league umpires and catchers is not overcome by the fact that the sale of wire masks (apparently sold largely to amateurs and semi-professional players) is much greater than that of plaintiff's mask, which is higher priced.

We are not impressed with defendant's contention that Johnstone merely adopted the pattern of helmets worn by knights of old, which would be worse than useless as baseball masks. Nor do we think the inventive element otherwise appearing is destroyed by the production, during the World War, of an aluminum alloy containing a small percentage of silicon, which overcame the brittleness of the previous alloys, and (or) by the fact that the price of aluminum *during the war* was so high as to make its use impracticable for manufacturing baseball masks. There is nothing in the record to indicate that any one but Johnstone ever thought of making a baseball mask with a cast shell of aluminum alloy.

So far as concerns the prior art, sufficient has already been said to warrant the exclusion of wire masks. The only prior patents apparently calling for special mention are those of White, No. 1,023,285 (1912) and No. 1,060,226 (1913), each allowed more than eight years before Johnstone's application. White's patents relate to boxing masks. Both differ in substantial particulars from the Johnstone invention. While the White patents each disclose a mask with a relatively stiff frame conforming to facial outlines, and having sight and breathing apertures, yet, even if thought to be in an art closely analogous to that of baseball masks, the Johnstone mask involves, not merely adaptation, but substantial structural differences from the White mask. See Haskell Co. v. Sales Co. (D. C.) 210 Fed. 624, affirmed (C. C. A.) 217 Fed. 407.[4] Cf. Haskell Co. v. Perfect Co. (D.

---

[4] Where it was held that a golf ball comprising a core of rubber thread wound under tension and a gutta percha inclosing shell was not anticipated by balls so made, but not used or intended for use in the game of golf, such as baseballs, etc.

C.) 143 Fed. 128. Johnstone's mask is unsuited for a boxing mask, from the standpoint, not only of the wearer, but of the opponent. In the Patent Office the White patent of 1912 was cited against Johnstone's application. The applicant's discussion seems to have satisfied the patent office.

The question of infringement remains. As already stated, the Goldsmith mask differs from the mask of the patent only in the substitution of a pair of flat spring bands, held in place under tension, for the integrally cast bars of the patent. Passing the question whether Goldsmith's so-called "frame," described in the advertisement as "a solid one-piece aluminum casting," does not correspond with the call in Johnstone's first claim for a "one-piece shell semi-ellipsoidal in shape," we think infringement is not avoided by the mere fact that Goldsmith's outwardly bulged cross-bars are not cast integral with the frame. Goldsmith's separately constructed steel bars are the mechanical equivalent of Johnstone's integrally cast bars.

[2] Defendant, however, invokes the well-settled rule that an intentional, although unnecessary, limitation cannot be overcome by applying the rule of equivalency. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800; Cimiotti Co. v. American Co., 198 U. S. 399, 415, 25 Sup. Ct. 697, 49 L. Ed. 1100. The question thus is: Must the call for a one-piece integral visor be construed as an intentional limitation to one structurally integral, as distinguished from one made integral by the permanent holding together of the parts and their integral operation or function? The distinction is illustrated by two decisions of this court. In Michigan Co. v. Monarch Co., 233 Fed. 107, 110, 147 C. C. A. 177, we thought a conclusion of intentional limitation to a pin formed integrally with the plate was supported by a number of considerations, including a manifest intent to distinguish the inventor's pin from that of another which was not so formed, together with the fact that the original claims made no mention of the word "integral," the use of which in the substituted claims we thought raised a natural inference that it was intended in the same sense as used in the specification, viz. "formed integral with the plate." On the other hand, in Clipper Co. v. E.-W Co., 237 Fed. 602, 606, 150 C. C. A. 484, we construed the word "integral," as used in the claim in describing two parts of a device as integral, as meaning that they are permanently held together and are operatively or functionally integral.[5]

We think the instant case within the rule of the Clipper Case. Here the four claims originally presented contained the expression "one-piece shell" and "one-piece integral visor," as in the claims allowed. There was nothing in the Patent Office history in any way emphasizing a feature of structural integrality of transverse bars and cast frame or shell, and nothing in the prior art in this regard from which there was occasion to distinguish. Goldsmith's separately manufactured steel bars are neither functionally nor operatively different from Johnstone's integrally cast bars. The Goldsmith structure, when the bars are in place, is intended to be permanent. Indeed, they are inserted under

5 See the reference (237 Fed. 608, 150 C. C. A. 484) to Michigan Co. v. Monarch Co., supra, as well as other cases.

such pressure that their removal by ordinary methods would be not only difficult, but dangerous.[6] Johnstone's first and second claims call for "outwardly bulged bars." We think their infringement clear. The third claim calls for "an enlarged face opening subdivided only by a single, narrow, transverse nose-protecting bridge extending horizontally to provide a substantially unobstructed vision to the wearer." The call in the fourth claim in this respect is not essentially dissimilar. We think the "face opening" referred to means the opening between the chin piece and the bar forming the lower limit of the crown, which is above the eyes. So construed, the third and fourth claims are infringed.

The decree of the District Court is affirmed.

---

[6] The fact that Goldsmith has been awarded a patent on his structure does not avoid a conclusion of infringement. Not only is the implied declaration of patentable difference not conclusive, but patentable difference does not of itself tend to negative infringement. Herman v. Youngstown Co. (C. C. A. 6) 191 Fed. 579, 585, 112 C. C. A. 185.