J. N. REED, Appellant,

v.

Dean G. PARRACK, d/b/a Lawn Mowing and Equipment Mfg. Co., Appellee.

No. 17934.

United States Court of Appeals
Fifth Circuit.

April 21, 1960.

Edward C. Gritzbaugh, Meyer A. Baskin, Miami, Fla., for appellant.

Harvie S. DuVal, Prebish & DuVal, Miami, Fla., for appellee, Dean G. Parrack.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

BROWN, Circuit Judge.

The question here is whether the District Court was warranted in finding that the accused device did not infringe the plaintiff-appellant's patent.[1]

Obscured in the probably unavoidable patentese of the sole claim in suit[2] is a

---

9. 1947, 330 U.S. 743, 754, 67 S.Ct. 1015, 91 L.Ed. 1219.

1. The patent, filed July 21, 1950, was issued June 15, 1954 to J. N. Reed, No. 2,680,945, on a combined mower and trimmer.

2. We refer, as the briefs did, to the elements of Claim 1 by identifying letters used by the trial court which we insert in brackets, e. g., [a]. As before the trial court, the numbers in parenthesis, e. g., (26), refer to the identifying numbers in the specification and drawings in the patent.

Claims 1 reads as follows:

"[a] a horizontally disposed place (3) providing a frame,

relatively simple device which, while not earth shaking in its importance, may be looked upon as a boon to our urbanized mechanical age. The machine is a power lawn edger. It is a hand-pushed apparatus somewhat smaller than a power lawn mower, with the cutting blade operated by a gasoline engine. Mechanically, its great contribution seems to be in the way the cutter head can be adjusted to make the cutter blade rotate in either a horizontal plane or a vertical plane. The commercial lure is the old one of two machines for the price of one. When the cutter blade is rotated in a vertical plane, it operates as an edger. While in a horizontal plane, it is substantially a lawn mower. However, it was never intended to be a combination edger-lawn mower. Considering the length of the rotating cutter blades, the radius of the cut is too restricted, the cut swath too narrow for effective use as a mower. As a lawn mower, it was designed primarily for use in close quarters around fences, walls and tree trunks.

The patent called for a flat frame bed with suitable wheels and a handle bar. The gasoline power engine was fixed in place on the frame. Also, on each side of the frame, there was an axle for the two rubber tired wheels upon which it would be pushed. Sticking out from the rear was a third wheel. Attached at the back and extending upwards from the frame was a handle bar. This handle bar was adjustable in its relative angle to the frame. When the machine was adjusted as a mower (horizontal cut), it rolled on these three wheels. When the cutter was fixed for edging (vertical cut), the machine would be rolled on the two main side wheels. To make the cut the operator would lift in an upward direction on the handle. This would tilt the frame down so that the cutter head would reach down sufficiently to make the cut. The third (rear) wheel would then be raised off the ground and would act as a counterbalance. With the cutter in a mowing position (horizontal cut), the third (rear) wheel could also be adjusted to increase or decrease the "tilt" of the frame. Within limits, this would permit determination of the depth of the cut. Since the third wheel was extended to the rear of the machine, the operator could also determine the depth of cut by lifting up on the handle.

The mechanism for changing from a vertical to horizontal (or vice versa) cut was quite simple. Power from the motor was transmitted through a flexible belt. The drive shaft with a drive pulley on one end and the cutter blade on the other was journaled in a metal sleeve equipped

"[b] a pair of ground engaging wheels (7 and 8), one at each side of said frame and upon which the frame is tiltable mounted,

"[c] a fixed post (2) upstanding from said frame in front of one of said wheels and having a horizontal bore (20) substantially in alignment with such wheel,

"[d] a support (24) comprising a shank (22) and a head portion, the latter having a bore at right angles to the shank,

"[e] said shank being mounted in the bore of said post for rotary and axial adjustment,

"[f] means (21) for holding said shank in adjusted position,

"[g] a sleeve (26) axially adjustable in the bore of said head portion and

"[h] means (27) for holding the sleeve in position of adjustment;

"[i] a shaft (30) revolvable in said sleeve,

"[j] a pulley (31) on one end of said shaft and

"[k] a cutting blade (34) on the opposite end,

"[l] a motor (1) supported on said frame,

"[m] a driving connection (23) from the motor to said pulley,

"[n] a guard (40) axially and rotatably adjustable on said sleeve;

"[o] a rearward extension (11) from said frame,

"[p] a ground engaging third wheel (9) mounted on said extension, and

"[q] an upwardly extending angularly disposed handle bar (15) having

"[r] adjustable pivotal connection (14) at its lower end to said rearward extension at a point intermediate the frame and said third wheel, said third wheel being raised from the ground and functioning as a counter balance when the implement is operated with said frame in a tilted position."

with suitable bearings. Perpendicular to this sleeve a rod (called a shank) was fixed so that it would resemble somewhat a "T" or "L" fitting. This rod was held in place by passing it through the bore or hole in a vertical post located on the front corner of the frame bed. This bore opening in the vertical post could be tightened to securely hold the rod (shank). The rod was in effect a continuation of the frame to allow the cutter head to be in front of the frame and outside the tracking line of the wheel on that side. To cut as an edger (vertical cut) the sleeve was moved to the horizontal. The drive pulley on the cutter head shaft would then be in a vertical plane as would be the drive shaft pulley on the motor. To cut as a mower (horizontal cut), the sleeve would be moved to the vertical, the cutter drive shaft pulley would be horizontal, and the drive belt would run through a quarter turn.

In comparing the accused device with the commercial embodiment of patentee's machine, the principal differences were these. The accused device had a third wheel in front which could be adjusted within a limited range by a rod from the handle bar. The handle bar, however, was fixed and not adjustable in its angle relative to the frame bed. The rod (shank) holding the cutter head drive shaft sleeve ran through a long welded sleeve forming a side edge of the frame, rather than through an upright post. One major difference between the patent disclosure and both the patentee's commercial model and the accused device was that in neither of them could the depth of the cut be adjusted by moving the cutter drive shaft sleeve with relation to the rod (shank) to which it was fastened.

The defendant did not challenge validity. The trial court assumed the patent to be valid. With the sparse, equivocal and, in so many ways, unsatisfactory record with which we have to deal in this case, we confine our review to infringement only, though public importance of the basic question now frequently leads courts to pass upon validity even though necessity therefor might be avoided by a declaration of noninfringement. Cf. Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 1959, 259 F.2d 398, 402.

The District Court disposed of this by a holding of no infringement. Fitting the findings of fact and this decisive conclusion of law together, the Court's basis was this. The patent, being on its face one for a combination, called for all of the elements [a] through [r], note 2, supra. Of these, there was missing from the accused device elements [g], [h], [o], [q], and [r].[3]

Although the defendant did not challenge validity as such, it did assert that the patent was in an already crowded field requiring a narrow construction and a like narrow range of equivalents. This was amply proved, as the Court expressly found, by the disclosure of the numerous prior patents cited as a reference in the patent itself, the file wrapper of its slow and tortuous passage through the Patent Office, as well as numerous other prior patents, particularly in relation to the means of permitting adjustment of the cutter to a horizontal or vertical plane. This may now be of no direct importance since we approach this in terms of an omission of elements. However, it may have some relevance in determining whether the element thought to be omitted was really an element, and whether its omission has been overcome by a substitution of substantial equivalence.

From all points of view, our task has become quite simple. Mechanically, we do not have to labor over just when and where a wheel in the front is the same as one in the rear. Nor must we face the juridical problem whether, as mechanical identicals, the law must regard them as something else because the patentee prescribed in most exacting terms that the

---

**3.** The Court also found element [c] missing, but we accept for purpose the patentee's contention that by the subsequent finding No. 9, the Court determined that the defendant's welded sleeve forming a part of the side of the frame bed was the equivalent of the "[c] * * * fixed post."

wheel should be mounted in the "[o] rearward extension (11) from said frame." Likewise we escape the problem whether the capacity to select initially the position of the front wheel on the accused device makes it (or subsequent operation of it), "tiltable" as a means of fixing the depth of the cut. We avoid these concerns because it is patent that in this patent another element was called for which is altogether missing in the accused device.

 This is the element identified by the District Court as [g] and [h], note 2, supra. Construing the claim in the light of the specifications and drawings as we must, Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, 195–196; United States Industries, Inc., v. Otis Engineering Co., 5 Cir., 1958, 254 F.2d 198, 201, what the patent called for can be described in simple terms. On the end of the rod or shank [e] sticking out in front of the machine there was to be a fitting through which the cutter drive shaft sleeve [g] would pass. This fitting would serve as a clamp around the sleeve and was to be so equipped as to permit the sleeve to slip up or down to the desired position at which point the clamp would be set by suitable means [h]. In this way the sleeve would be held in the position of axial adjustment. The obvious purpose of this as the patentee emphatically testified was to permit the depth of the cut to be fixed.[4]

It was uncontradicted that the accused machine does not have this mechanism nor can any such adjustment in depth of cut be made. On the accused device, the rod or shank which passes through the welded sleeve is permanently—and as the patent solicitor would say—and unmovably fastened to the cutter head drive shaft sleeve. By moving the lever on the handle bar, the cutter head may be shifted from the horizontal to the vertical cutting position. But its position relative to the ground (in a mowing position) or to the outer edge of the frame (edging position) is constant.

To avoid this undeniable mechanical operational fact, the patentee makes two responses—one explicit, the other implied but both of which are really shadings of the same idea. The explicit one is that this adjustability was immaterial to the functioning of the combination. The implied one is that the depth of the cut can still be determined. The latter disregards the requirement that any such capability, if it is to overcome the exculpation of an omitted element, must accomplish this in substantially the same way. On this feature, the most the patentee can say is that by adjusting the front wheel to permit upward or downward tilting of the frame the depth of the cut can be fixed. But this will not do for several reasons. It is not mechanically equivalent in any real sense of the word. Tilting contemplates a change of the angle of the frame relative to the ground. The axial adjustment of the cutter head drive shaft sleeve raised or lowered the cutter blades whether the frame was tilted or not. More important, the patent described this tiltability through adjustment of the third (rear) wheel as an *additional* means of determining the depth of the cut.

 As an explicit counter-contention of immateriality it is even less acceptable. This ignores the nature of a combination patent. The novelty is not in the elements. Indeed, in many, if not most, patents for a combination—and certainly this one—the individual components are old, well known parts. The novelty which warrants the patent is in the way in which these things known to skilled artisans are combined to produce a new result or an old result in a new and better way. Bryan v. Sid W. Richardson,

---

4. The axial adjustment of the sleeve [g] would be effective only for use in the mowing position, i. e., when the cutter head was horizontal and the cutter head drive shaft sleeve was vertical. When the machine was set as an edger, little would be served since this would only move the vertical cutter blade in or out. The extent of this adjustment would be limited by the side of the frame bed and the position of the wheel on that side.

Inc., 5 Cir., 1958, 254 F.2d 191, 194. If, to paraphrase the playwright "the combination is the thing" then all that goes to make up that combination is indispensable to its very existence. In more traditional terms, this leads to the universal principle of patent law that in a combination every element is essential, and the patentee may not after issuance assert that that which was described as essential was immaterial after all. United States Industries, Inc. v. Otis Engineering Corp., 5 Cir., 1958, 254 F.2d 198, 203; Dry Hand Mop Co., Inc. v. Squeeze-Ezy Mop Co., Inc., 5 Cir., 1927, 17 F.2d 465, 466; Cimiotti Unharing Co. v. American Fur Refining Co., 1905, 198 U.S. 399, 410, 25 S.Ct. 697, 49 L.Ed. 1100, 1105; Black Diamond Coal Mining Co. v. Excelsior Coal Co., 1895, 156 U.S. 611, 15 S.Ct. 482, 39 L.Ed. 553; Dobson v. Cubley, 1893, 149 U.S. 117, 13 S.Ct. 796, 37 L.Ed. 671; Wright v. Yuengling, 1894, 155 U.S. 47, 15 S.Ct. 1, 39 L.Ed. 64; Derby v. Thompson, 1892, 146 U.S. 476, 13 S.Ct. 181, 36 L.Ed. 1051; Weatherhead v. Coupe, 1893, 147 U.S. 322, 13 S.Ct. 312, 37 L.Ed. 188; Central Foundry Co. v. Coughlin, 5 Cir., 1905, 141 F. 91, 94; Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 1959, 259 F.2d 398; 3 Walker, Patents § 461 at 1695–1697 (Deller ed. 1937); 2 Walker, supra, § 268 at 1257–1259. If an element is completely missing as it is here and the function of that element is not afforded by that which remains, then there can be no infringement no matter how immaterial from a practical operational sense the missing component may have been.

It may be unfortunate that an element discarded by the patentee because it "would not work" and from a viewpoint of practical utility probably unimportant in any event affords an automatic insulation to one accused of infringement. But this consequence follows naturally and logically from the nature of a combination patent and the principle that it is the patentee who determines how much he is claiming to be within his monopoly and, on the other hand, how much he is releasing for unrestricted public appropriation. Mahn v. Harwood, 1884, 112 U.S. 354, 361, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665, 668; 2 Walker, Patents, § 256 at 1231 et seq.; § 165 at 769–770. It is the hard lesson so much a part of every breathing moment of a patent solicitor's life—calling for a precision and a prescient forecast encountered in few other facets of the law—of claiming enough but not too much.

Affirmed.