**Horace B. BROSE, Plaintiff,**

v.

**SEARS, ROEBUCK AND CO. et al.,**
**Defendants.**

**Civ. No. 68–860.**

United States District Court,
S. D. Florida,
Miami Division.

Dec. 31, 1970.

John Cyril Malloy, Miami, Fla., and Carl V. Wisner, Jr., Fort Lauderdale, Fla., for plaintiff.

G. F. Rothwell, of Sughrue, Rothwell, Mion, Zinn & MacPeak, Washington, D. C., and Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ATKINS, District Judge.

### FINDINGS OF FACT

#### I. Preliminary

1. This is an action under the patent laws of the United States for infringement of Brose Reissue Patent 26,368. The patent was granted April 9, 1968, entitled "Tire Repair Insert" (hereinafter patent in suit or reissue patent). It is used to repair tubeless tires which went into public use about 1955.

2. Jurisdiction is based on Title 28 United States Code, Section 1338.

3. Plaintiff Horace B. Brose (hereinafter Brose) owns the patent in suit. He alleges claims 1, 11, 14 and 16 (hereinafter claims in issue) are representative and are the only claims considered by the Court.

4. The defendant, Sears, Roebuck and Co., sold a Tubeless Tire Repair No. Kit 28–1048, and defendant Huffman sold a Wizard Tubeless Tire Repair Kit No. A4414 within six years prior to filing this suit. These goods (hereinafter accused goods or defendants' kits) are alleged to infringe the claims in issue.

5. Defendants allege in a counterclaim for declaratory judgment that the patent in suit is invalid and not infringed.

#### II. Definition of Objects and Identification of People

6. The term "needle" is used by the Court to refer to a hand tool used for inserting tubeless tire repairs. A needle includes a shank, a handle on one end of the shank, and an eye or other opening along the shank or at its other end. The needle eye may be either open or closed making the needle either an "open eye needle" or a "closed eye needle". An open eye needle may be a style known as a tuning fork needle in which one of the forks is longer than the other, or an English needle (sometimes called an English eye needle). In a closed eye needle, the eye on the shank is completely closed so that an insert threaded through the eye cannot be removed unless the insert is cut or unthreaded.

7. A tubeless tire repair insert (hereinafter insert) is a small piece of resilient material such as rubber which may be layered or laminated of various types of rubber and which is inserted into an injury opening in the tire by a needle to repair the tire by plugging the injury opening. The insert may have a vulcanizable layer or layers which are vulcanizable to the walls of the tire injury opening. A vulcanizing cement can be used in the vulcanizing process.

8. John Kraly (hereinafter Kraly), now deceased, was in the tubeless tire repair business from 1941 through 1960. He was also an acquaintance and former business associate of Brose.

9. Ephraim Banning, III (hereinafter Banning) is a patent attorney, now retired, who represented Brose in the preparation and prosecution of the patent in suit and its preceding applications. He also represented Kraly in the preparation and solicitation of Kraly patent 3,095,342, filed December 15, 1961, granted June 23, 1963, (hereinafter Kraly patent). Banning is a member of the Illinois Bar. He prosecuted, over a period of 40 years, an estimated 4000 patent applications.

10. Robert A. Flory (hereinafter Flory) is Chief Chemist and Plant Superintendent of H. B. Egan Manufacturing Co., a purveyor of rubber for tire repairs.

11. H. B. Egan Manufacturing Co. (hereinafter Egan) manufactures the accused goods (plaintiff's Exhibits 2 and 3) for the named defendants, with a license under the Kraly patent.

### III. The Patent in Suit

12. The patent in suit, reissue patent 26,368, is a reissue of original patent 3,174,525, granted March 23, 1965, on an application filed November 21, 1963. Original patent 3,174,525 was a continuation-in-part of a Brose application filed January 22, 1962, serial No. 167,724, now abandoned.

13. The patent in suit discloses an insert which desirably consists of a multiply wafer having a resilient base lamination of cured rubber and a pair of uncured vulcanizable facings. One convenient size of the laminated insert, in a commercial embodiment, is one inch by one half inch with a thickness about .086 inch. See Fig. 1, Exhibit A, appended.

14. The patent in suit discloses the insert is installed with an English eye needle by placing the insert with its midpoint in the eye of the needle (see Fig. 3, Exhibit A, appended) and then, after lubricating the insert and injury opening, forcing the insert carried by the eye of the needle through the injury opening until the handle of the needle is stopped by the trailing legs of the insert at the outside of the tire casing. See Fig. 11, Exhibit A, appended. The needle is then withdrawn and the portion of the insert which has been carried to the inside of the tire casing by the needle eye is free resiliently to contract and form an "eye roll". The pressure thus formed engages the inside surface of the tire casing surrounding the injury opening to provide a seal. See Fig. 12, Exhibit A, appended.

15. The term "eye roll" is defined in the patent in suit, by eight characteristic physical features. These include "a substantial area of the roll periphery which is deformed to engage flatwise with the inner face * * * of the tire in the area immediately surrounding the * * * injury opening" and "the eye roll head is maintained in tight resilient engagement with the tire inner face to provide an effective seal thereat." See Fig. 6, Exhibit A, appended. Brose stated that the eye roll is the inventive concept and gist of his invention.

16. The patent in suit also discloses a chemical bond between the insert and the tire. This is accomplished by vulcanization of the uncured facing layer of the insert to the walls of the injury opening by the utilization of vulcanizable cement. The mechanical interlock provided by the eye roll "may prove inadequate" and "pop out * * * of the insert * * * (which) is a possibility." Thus there is a need for a vulcanized bond of the insert to the tire.

### IV. The Claims in Issue

17. Claim 1 is a claim to a method of forming an eye roll head. This claim includes as essential elements the following steps: (1) folding the insert transversely upon itself, (2) applying a tractive force inwardly of the insert fold to advance the insert into the lubricated injury opening, (3) halting the applica-

tion of tractive force when the insert has advanced to a predetermined position, (4) controllably withdrawing the application of tractive force to permit contraction of the insert and thereby produce an eye roll head in sealing position against the inner tire face. The eye roll head is laterally deformed to engage continuously with the inner face of the tire casing over an extended area surrounding the end of the injury opening.

18. Claim 11 is a claim to the combination of a tire with an injury opening. An insert is placed in the opening utilizing rubber based cement to provide a short lived lubricant. The insert is installed so as to provide an eye roll head deformed to engage sealingly with the inner surface of the tire casing around the injury opening. The installed insert's outer layers are vulcanized to the walls of the injury opening and to the insert's base layer.

19. Claim 14 is directed to a method of repairing an injury opening in a tire. A needle and an insert are utilized by moving the needle inwardly until its handle engages outwardly the projecting ends of the insert. The limbs are stretched thereby approximating twice their original length. When the insert portion within the casing contracts, it forms an eye roll head in engagement with the inner surface of the tire.

20. Claim 16 is another claim to a combination of a tire with an injury opening. An insert is used with a rubber base cement, the insert being installed to provide an eye roll head which is deformed at the inner face of the tire to "pressure engage" the inner surface of the tire casing continuously over an extended area immediately adjacent to and around the injury opening to provide an effective air seal. The outer layers of unvulcanized rubber are vulcanized to the insert's base layer and to the walls of the injury opening.

## V. Genesis and Patent Office Prosecution History

21. Kraly authorized Brose to contact Banning and furnish him with the information for the preparation of a patent application. This was subsequent to February, 1961.

22. Among associates to whom Brose looked for information for the preparation of the patent application by Banning was Robert Flory, Chief Chemist for Egan. According to Brose's testimony, at the outset Brose was dissatisfied with the performance of the cylindrical Kraly plug (Plaintiff's Ex. 6) and began experimenting on his own as early as December, 1960. A sample of the rubber which he used is in evidence as Plaintiff's Ex. 28. On July 29, 1961, Brose wrote Flory for information (Plaintiff's Ex. 15) and Flory replied on July 31, 1961, (Plaintiff's Ex. 16):

"My own personal opinions in regard to a patent claim are as follows:

"#1—You should emphasize the fact that your plug is to be used with a vulcanizing cement.

"#2—Stress the physical characteristics of your plug, i. e. a flat wafer not completely covered with facing, one that will provide full facing contact when inserted.

"#3—Emphasize the fact that your plug provides an umbrella on the inside of a tire after insertion."

Although Plaintiff's Ex. 15 makes no mention of it, Brose testified that he sent a small section of tire to Flory with a plug inserted, an example of which is in evidence as Plaintiff's Ex. 15A. A configuration on the inside of the tire section was the object which Flory referred to as the "umbrella". Flory was knowledgeable on patent matters as is evidenced by his letter to Brose of October 9, 1961 (Defendant's Ex. 3, composite) in which he states:

"We have not made any application for a patent on this feature in our tire repair products simply because it is a feature which at least a half dozen com-

panies are utilizing and I personally doubt whether it is patentable."

23. Brose sent the Flory "umbrella letter" (Plaintiff's Ex. 16) to Banning. The latter replied to Brose on August 15, 1961, stating in the fourth paragraph:

"I presume that Mr. Flory uses the term 'umbrella' to mean the exposed end of the insert at the inner face of the casing and perhaps it is well to so designate it, or to call it a rump as distinguished from the enlarged head at the opposite end at the outer face of the casing. I note the umbrella is at the folded end of the insert where no lamination ends are exposed, an opposite condition existing at the head end of the insert. Can we make a point of advantage about this, and if so what is it?"

Brose annotated the Banning letter (Plaintiff's Ex. 20) and returned it to Banning for further attention. Brose's notes include a drawing of an eye-roll, designating it as such, and further stating:

"The umbrella on inside of casing is self made & guarantees that insert can never be blown out thru hole, even with 100 lbs of casing pressure."

This is the first instance of the reference to the eye-roll in any of the correspondence.

24. Banning prepared a draft of an application for Kraly and Brose which he transmitted to Brose on August 22, 1961, which Brose returned to Banning with extensive comments without referring it to Kraly. (Plaintiff's Exs. 21–22).

25. Prior to July 8, 1961, Kraly had developed a new type of needle for his wafer (Plaintiff's Ex. 12) a sample of which is in evidence as Plaintiff's Ex. 14. On August 26, 1961 (Plaintiff's Ex. 22) Brose advised Banning of this development and provided Banning with a sample of the devide and drawings showing the method of its use. The new needle, referred to during the hearings as the "closed eye" needle, required a separa-

tion of the wafer into two parts on the interior of the tire which was effected by a quick jerk by the operator.

26. In rejecting the joint application, Kraly wrote Banning at length on October 26, 1961. (Plaintiff's Ex. 8). Defendants contend Kraly's approval in this letter of the depiction of the eye-roll in Fig. 6 of the joint application as justification for their assertion that Kraly, not Brose, invented the eye-roll. This is refuted by the circumstance that the eye-roll cannot be produced with the closed eye needle (Plaintiff's Ex. 14) which Kraly favored, and Kraly's later instructions to Banning (Plaintiff's Exs. 31, 33 and 34) which eliminated all figures from sheet 1 of the joint Kraly-Brose application (Plaintiff's Ex. 23) except Fig. 1 illustrating the Kraly wafer (Plaintiff's Ex. 12). Kraly's attitude toward the tuning fork type of needle is shown in a letter to Brose of November 16, 1961 (Plaintiff's Ex. 29):

"With the closed end needle I couldn't use the folded one anyway, especially the large insert and they're wonderful for large holes. The whole trouble with you is that you don't have the experience regarding the art of repairing tubless (sic) tires. I gave some of the heavy needles to a few of the guys that are still using the open end needle and they don't want the damn big thing. I have over 500 customers that used the open end needle and are now using the closed end needle and everyone likes it better than the open end. I like the closed end needle so there's 501 of us. That should be proof enough that the closed end is better, and once you'd know how to use it you like it better too. But I just can't drive it into your head that the closed end needle is better * * * * *";

27. Banning prepared the application in the Fall of 1961 as a joint application listing both Kraly and Brose as joint inventors (hereinafter the Kraly-Brose joint application). Kraly objected and the joint application was not filed in the Patent Office. It was, however, used as

a basis of separate applications filed by Brose and Kraly. The Kraly application was filed December 16, 1961 and became Kraly patent 3,095,342. The drawings disclosed *only* the closed eye needle. The Brose application was filed January 22, 1962, Serial No. 167,724 (hereinafter Brose abandoned application).

28. Banning prepared an application which ultimately went to issue as Kraly Patent No. 3,095,342 which discloses in the drawings *only* the closed eye needle and in commenting on the application before he signed it. Kraly told Banning (Plaintiff's Ex. 35) on November 28, 1961:

"You done a fine job and everything you wrote is O.K."

29. By these activities, Kraly disclaimed or repudiated any inventorship of the eye-roll and I find that plaintiff is the first, original and sole inventor thereof.

30. Defendants assert that Defendants' Ex. 13, Kraly's abandoned application Serial No. 84,847 for a tuning fork type of needle, filed January 25, 1961, discloses an eye-roll. I find, however, that there is no showing that a cylindrical object of the type Kraly was using in January, 1961 (Plaintiff's Ex. 6) with the type of needle (Plaintiff's Ex. 7) disclosed in the abandoned Kraly application (Defendants' Ex. 13) could produce an eye-roll having the characteristics disclosed in the patent in suit.

31. Plaintiff filed the parent application of the patent in suit as Application Serial No. 167,724 on January 22, 1962 (Plaintiff's Ex. 39) and, prior to the abandonment of that application, filed Application Serial No. 325,274 on November 21, 1963, which was issued as original No. 3,174,525 on March 23, 1965. Plaintiff then filed reissue Application No. 607,342 on November 30, 1966 which issued as Re. 26,368 on April 9, 1968. The parent application (Plaintiff's Ex. 39) was directed to three features, a twisting feature shown in Fig. 6 of the drawing, a folding feature shown in Fig. 2 of the drawing, and an eye-roll shown in Fig. 7 of the drawing, identified by reference letter *e*. In the continuation in part, plaintiff abandoned the twisting feature, subordinated the folding feature, but retained the eye-roll which satisfies the requirements for an eye-roll defined in the patent in suit, column 6, line 41, through column 7, line 49. Thus I find that the eye-roll of the patent in suit was fully supported in the original abandoned application of which the original of the patent in suit was a continuation in part.

32. Defendants assert that Banning, the patent attorney who prosecuted the original Brose application, (Plaintiff's Ex. 39) the continuation in part (Defendants' Ex. 11), and the re-issue application (Defendants' Ex. 12), misrepresented to the examiner the teachings of Kraly and Chambers to secure the issue of the continuation in part and the re-issue patent over these references. I find that Banning presented Chambers and Kraly to the examiner as he understood them, and in accordance with their disclosures, and that there was no intention on Banning's part to mislead the examiner and in truth, no such result occurred. On the contary, when it came to Banning's attention through the prosecution of a Canadian application that Call was a pertinent reference, Banning promptly filed an application for a re-issue of Brose original No. 3,174,525, directing the examiner's attention to Call, and narrowing the claims so that they would be allowable over Call. Shoemaker and Mattare were Washington patent lawyers whom Banning engaged for his dealings with the Patent Office.

## VII. Defendants' Kits

33. The defendants' kits are substantially identical. They both contain an English eye needle, six laminated inserts, and a small tube of cement mounted on a packaging card which contains instructions for installation of the insert into an injury opening in the tire. These instructions direct the user to lubricate the injury opening with the cement applied to the needle, stretch the center of the patch (insert) into the open eye of

the needle and apply cement to the needle and the patch, then insert the needle with the patch into the injury pushing until the handle hits the tire and turn the needle one quarter turn and slowly remove it from the tire. The defendants' kits are marked "licensed under patent 3,095,342" (the Kraly patent), the inserts in defendants' kits are licensed, and the Kraly patent claims the laminated insert.

34. There was no proof that the defendants or anyone else followed the instructions on defendants' kits and repaired tires or sold punctured tires with a repair in them. The ultimate users of defendants' kits would be the consuming public.

## VIII. Prior Art

35. Defendants rely upon the follow-the prior art patents:

| | |
|---|---|
| McAllister | 606,570 |
| Call | 614,287 |
| Weatherwax | 666,369 |
| Weigele | 743,963 |
| Nickum | 1,363,163 |
| Chambers | 2,966,189 |
| Kraly | 3,095,342. |

Of the foregoing prior art references, British Call No. 24,118 (1898) is the equivalent of Call. Chambers and Kraly were file wrapper references on the reissue patent. The reissue application was occasioned by a reference to British Call in a Canadian prosecution and it was felt desirable by Banning to narrow the claims somewhat in the light of that reference. I find, however, that none of the references which were not before the Patent Office were superior in any respects to the references considered by the examiner in the original and reissue applications. All were concerned with bicycle tires, not the modern tubeless type of automobile tire, with which the patent in suit is concerned. I find it significant that the inter-parties' tests were conducted by way of deposition at Muskogee, Oklahoma, on November 17 and 18, 1969, at the Egan works. Two

tests were run. In the first test reflected in defendants' physical Ex. 5, six repairs were made utilizing alleged infringing inserts. Test numbers 3 and 4 were intentionally mutilated by the person performing the test over the objections of the plaintiff. The test tire was run for sixteen hours at sixty-five miles an hour for a total of 1,020 miles and at the completion of the test, the tire was found to be in satisfactory condition. The second test sample (defendants' physical Ex. 9) included eight repairs, two rubber bands, two Chambers type inserts and four Kraly type inserts, all over the objections of plaintiff. Defendants' physical Ex. 9 was run for 5.6 miles for a few minutes at sixty-five miles an hour. I find as a fact that the tests of defendants' physical Exs. 5 and 9 were not comparable and defendants' physical Ex. 9 has no persuasive evidentiary value.

36. Defendants assert that both Kraly and Chambers in their patent disclosures taught the procedures for the making of an eye-roll and pictorial suggestions of the supposed teachings were offered in evidence over plaintiff's objections as Defendants' Exs. 15A and 15D. See Exhibits C and B.

37. In support of the asserted Chambers teaching, defendants rely on the following statement from column 4, lines 54 to 56, in the Chambers patent:

"However, it (referring to the plug) can be doubled back on itself and in that case the forked end of the tool will engage it intermediate its ends."

Chambers does not show an eye-roll in any of his drawings and his descriptive material relating to the insertion of his plug would not lead to the formation of an eye-roll.

38. (a) In respect of the supposed Kraly teaching, defendants rely on the following language in column 5, lines 66 to 72:

"Two different techniques available for installation of the present insert have been explained by way of example, but it may be advanced otherwise to an effective sealing position

within a tire injury opening, a practical and successful way of doing so being indicated in my pending application entitled Tubless (sic) Tire Repair Tool, filed January 25, 1961, Serial No. 84,847."

None of the drawings of Kraly Patent No. 3,095,342 shows the formation of an eye-roll and Kraly specifically disclaimed any such result in his correspondence to Banning and plaintiff. (Plaintiff's Exs. 25, 27, 29, 31, 33 and 34).

(b) It is meaningful that if either Kraly or Chambers accidentally produced an eye-roll, they failed to recognize its novelty, or effectiveness and did not incorporate the details in their patent specifications with the precision required by § 112, Title 35, U.S.Code (Patents). Such developments, if they occurred, must be regarded as abandoned experiments. Of further importance is the circumstance that Flory, experienced in the tire repair art, on being shown a sample of an eye-roll, suggested that Brose "emphasize the * * * umbrella on the inside of a tire after insertion" (Plaintiff's Ex. 16) and that Brose immediately recognized (Plaintiff's Ex. 20) in his comments to Banning that "the umbrella * * * guarantees that insert can never be blown out through hole * * *" Thus, experienced practicers of the art of tubeless tire repairs, such as Kraly and Chambers, tended away from, not toward the eye-roll. (See Findings 22 and 23 above).

(c) It is persuasive that in none of his letters to Banning did Kraly request the inclusion of a reference to abandoned Application Serial No. 84,847 in the patent application which Banning was preparing. In plaintiff's Ex. 31, dated November 7, 1961, Kraly stated to Banning, p. 2:

"The only reason I delayed in sending you the tool application is because I wanted to get the reference number (Serial #) which we received yesterday so now you can refer to that number in the new application serial #146,818."

This Banning, did, as shown by Plaintiff's Ex. 38, column 3, line 73 to column 4, line 1;

(d) The patent statute § 112, Title 35, U.S.Code (Patents) provides:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertained, or to which it is most nearly connected, to make and use the same * * * *"

39. The fragmentary references to the Chambers and Kraly specifications, upon which defendants rely, are insufficient to demonstrate that either Kraly or Chambers invented the eye-roll, prior to Brose.

### IX. Results of Using Defendants' Kits

40. In using the needle, inserts and cement contained in defendants' kits (the accused goods) and following the instructions contained on the packaging cards for the kits, the result obtained is an insert installed within a tire injury opening. The insert is vulcanized to the walls of the injury opening only and has a loop portion which extends inwardly inside the tire casing. This loop portion performs no sealing function and on some occasions drops off in use with no effect upon the sealing with the inner tire face around the injury opening.

The loop produced in the use of the accused goods does not sealingly engage the inner surface of the tire casing nor provide an effective seal around the injury opening at the inner surface of the tire casing. The loop on the inside of the tire casing produced by the use of the defendants' kits is the inherent and natural result of installing a *two* inch long insert doubled in a lubricated tire injury opening using an English eye needle.

### X. Public Use

41. Claim 14 in suit contains the so-called "stop" feature which was added

by the continuation in part. This feature is delineated in the claim:

"* * * continuing to move the tool inwardly until the end of the enlarged handle portion of the tool engages the outwardly projecting ends of the insert and until inward movement is limited by such engagement whereupon the insert has been advanced through a predetermined distance * * *".

Plaintiff's first sale occurred in August, 1961, more than a year prior to the filing of the continuation in part. At that time plaintiff was using a tool similar to the Kraly tuning fork needle (Plaintiff's Ex. 7) which does not permit the exercise of the stop feature. There is no showing of record when plaintiff began selling inserts in combination with the tool having the "enlarged handle portion" 11, Fig. 2 of the patent in suit. A patent is presumed to be valid and the burden is upon the defendants to show prior public use beyond a reasonable doubt. No such showing has been made in the instant proceeding by the defendants. The "stop" feature is not an element of the other claims in suit.

## XI. Infringement

42. Brose did not prove that following the instructions on the accused goods would produce a method or combination that would find response phrase for phrase in the claims in issue. Specifically, Brose did not prove that following the instructions with accused goods would produce an eye roll which was laterally deformed to engage sealingly the inner surface of the casing completely surrounding the injury opening (Claim 1). To the contrary, the proofs adduced at trial showed that the loop produced as an inherent result of using the open eye needle has no sealing function whatever. Brose did not prove the effect of the cement in the accused goods and in their use or the resulting seal around the eye roll of an installed insert (Claim 11). Brose did not prove that the insert during such installation stretches approximately twice its length and produces an eye roll with a laterally de-

formed portion (Claim 14). Brose did not prove that in the use of the defendants' kits an eye roll which produces an air seal by pressure engaging the inner face of the tire casing is produced (Claim 16). Obtaining an "eye roll" as defined in the specification of the Brose patent in suit is an essential element of each claim in issue and is absent from the loop produced by the use of the subject kits. See Exhibit D.

## XII. Intervening Rights

43. Egan began marketing the product of Plaintiff's Ex. 2 (Tr. 233) in December, 1964. This was obviously prior to March 23, 1965 when original Patent No. 3,174,525 issued to the plaintiff. There is no showing in the record of when either of the defendants began marketing Plaintiff's Exs. 2 or 3; § 252, Title 35, U.S.Code (Patents) provides in its second paragraph:

"No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent * * *"

Claims 1, 11 and 14 of the reissue patent in suit were in the original patent, and the only changes therein in the reissue patent were a few words which did not in any way enlarge or modify their substance.

## XIII. Obviousness

44. In respect to its § 103 defense that the subject matter of the patent in suit was obvious, I find that none of the prior art identified in Finding 35, taken either individually, or collectively as a whole, was such as to render the invention of the patent in suit obvious to a person skilled in the art of tubeless tire repairs.

## XIV. Privileged Document

45. At the trial, defendants offered a series of documents as follows:

| Defendants' Ex. No. | Particulars |
|---|---|
| 21 | Letter, Brose to Banning, 2/17/66 |
| 22 | Letter, Brose to Banning, 7/19/63 |
| 23 | Letter, Brose to Banning, 8/5/63 |
| 24 | Letter, Brose to Mattare, 8/8/64 |
| 27 | Letter, Banning to Mattare, 7/27/63 |
| 28 | Letter, Brose to Banning, 7/30/63 |
| 29 | Letter, Brose to Banning, 12/7/63 |

At the outset at defendants' discovery deposition of plaintiff, plaintiff's counsel stated that he waived privilege as between Banning and Brose on behalf of Brose prior to the filing of the Brose application. During the course of the deposition, the Kraly Estate waived privilege as to Banning on transactions between Banning and Kraly. Plaintiff has objected and continues to object on the grounds of privilege to any use by defendants of correspondence after the filing of the Brose application on January 22, 1962. Nevertheless, pursuant to a motion to produce, numerous documents were made available by plaintiff to defendants. Of the documents so made available, those listed above had been offered in evidence and received subject to plaintiff's continuing objection of privilege. I also indicated that I would reconsider the privileged status of these documents. It has been previously found (Finding 9) that Banning was admitted to the Bar of Illinois and to the Patent Office and was Brose' attorney from 1935 onward on numerous occasions. Shoemaker and Mattare are attorneys in Washington, D. C. (Finding 32) Washington patent lawyers whom Banning engaged for his dealings with the Patent Office. Having reconsidered the status of these documents I find that they were in fact privileged and the objection to the above numbered exhibits are sustained. The documents are stricken (except for purposes of proffer) and have not been considered by the Court.

## XV. Plaintiff's Objections to Defendants' Exhibits 3 and 4, 16 B, C, D, and E, and to Portions of Kenneth Kraly's Deposition

46. I find that Defendants' Exhibits 3 and 4 were received into evidence and so marked by the Clerk. The record should reflect that the Court has found affirmatively that these exhibits were offered and admitted in evidence and the objections of the plaintiffs are overruled. Defendants' Exhibits 16 B, C, D and E were not offered in evidence and therefore have not been admitted. The Court will indicate its rulings on Plaintiff's objections to portions of the deposition of Kenneth Kraly by appropriate notation on the margin of particular pages of the original deposition.

## XVI. Conclusions of Law

47. This Court has jurisdiction over the parties and the subject matter. 28 U.S.C. § 1338.

48. Claims 1, 11, 14 and 16 of the patent in suit are valid.

49. The plaintiff did not prove that the accused goods produced every element of the combination or followed every step of the method. On the contrary, the admittedly critical feature and "gist" of the patent in suit, the eye roll, is not produced by defendants' kits following the instructions thereon. General Steel Products Co. v. Lorenz, 204 F.Supp. 518 at 532; Reed v. Parrack, 276 F.2d 784 (5th Cir. 1960).

50. None of the claims in issue of the patent in suit is infringed.

51. Defendants have not established any intervening rights under § 252, Title 35, U.S.Code (Patents).

52. The litigation is not exceptional within the meaning of § 285, Title 35, U.S.Code (Patents).

53. Having found as a fact (Finding 45) that certain documents passing after January 22, 1962 between plaintiff and his attorneys were privileged documents, the judgment to be entered herein should require defendants, their attorneys and

agents, and National Distillers and Chemical Corporation and its H. B. Egan Manufacturing Company Division, their attorneys and agents, to return to plaintiff all copies of documents received by them during the discovery process passing between plaintiff and his attorneys after January 22, 1962, and refrain from publishing in any manner any of the contents thereof. The Clerk should be ordered to return to plaintiff the documents identified in Finding 45, supra.

Each party shall assume his and their own costs.

Counsel for plaintiff shall submit a form of judgment within 20 days. Defendants' counsel shall have ten days thereafter to submit proposed amendments as to form.

## APPENDIX

Exhibit A

FIG. 1.

FIG. 3.

FIG. II.

FIG. 12.

FIG. 6.

[A4006]

CHAMBERS (ET AL) PATENT 2966189 TEACHING

Exhibit B

## FIG. 1

"the repair unit... slipped into a forked tool ready for insertion into the tire injury opening" Col. 2, line 72 - Col. 3, line 2

"the forked end of the tool will engage it (the plug) intermediate its ends" Col. 4, lines 55-56

"...the plug unit... may be of other cross sectional forms, for example, angular..." Col. 6, lines 18-20

30

31

25

## FIG. 2

"...(the plug) can be doubled back on itself... Col. 4, line 55

## FIG. 3

30

25

C

"the portion of the plug within the opening is stretched... the tool... will pass... a substantial distance into the casing", Col. 4, lines 60-66

## FIG. 4

"...the forked tool is... withdrawn..." Col. 4, lines 66-67

## FIG. 5

6    6

"...the plug will tend to expand to its original cross section." Col. 4, lines 67-68

## FIG. 6

22

"The attaching layer... 22 which surrounds the core... 21 is of uncured or unvulcanized... rubber." Col. 3, lines 66-68

[A4007]

KRALY PATENT 3,095,042 TEACHING

Exhibit C

FIG. 5

"the tire sealing insert I... a multi-ply wafer having a resilient lamination 1 of cured rubber... forming a base...between a pair of uncured rubber laminations 2." Col. 2, lines 67-71

"the insert remains unfolded...up to the point of its tractive entry into the opening..." Col. 4, lines 70-72

FIG. 6

"... covers 3 of Holland cloth..." Col. 3, line 13

FIG. 2

"applicator advanced a sufficient distance to carry the insert within and through the tire injury opening" Col. 2, lines 23-25

FIG. 7

"the insert being stretched and doubled upon itself during this advance to extend in part beyond the inner face of the tire" Col. 2, lines 25-27

Tubeless Tire Repair Tool. A of S. N. 84,847 filed Jan. 25, 1961

"...the applicator retracted from the position of FIG. 6..." Col. 2, line 28

FIG. 3

"expanded head h" Col. 5, lines 7-8

FIG. 8

"the...insert...may be advanced... to an effective sealing position...a practical and successful way of doing so being indicated in my pending application entitled Tubeless Tire Repair Tool, filed January 25, 1961 Serial No. 84,847." Col. 5, lines 67-72

"a ball head b... remains engaged with the inner tire ...face i" Col. 5, lines 23-24

[A40008]

# COMPARISON OF EYE ROLL HEAD AND LOOSE LOOP

EYE ROLL HEAD

INVENTOR

HORACE B. BROSE

The head *h* thus formed is regularly characterized by these physical features: (1) the eye-ball diameter builds up to at least three times that of the injury opening wherein the insert body remains confined; (2) the cross-sectional diameter of each insert limb becomes substantially equal to the radius of the roll; (3) the axis of the roll is disposed transversely of the injury opening; (4) the peripheral curvature of the roll extends through 270 degrees or more; (5) the roll is also substantially elongated in an axial direction; (6) a substantial area of the roll periphery is deformed to engage flatwise with the inner face *i* of the tire in the area immediately surrounding the proximate end of the injury opening; (7) the roll head throughout is tensioned by (a) an enhanced stretching of the outer radial portion of its body, and (b) an enhanced compression of its inner radial portion, thereby firming up the entire head *h*; and (8) the eye-roll head is maintained in tight resilient engagement with the tire inner face *i* to provide an effective seal thereat. The head thus formed is considerably larger, firmer, and more effective than is the head *f* at the tire tread face *i*.

I claim:

1.

the two limbs to expand reactively into the form of [an] *a single pliable* eye-roll head, concurrently with a lengthwise contraction of *its attenuated linics* within the opening, tending to draw the newly-formed *pliable head into sealing position* [head into tight engagement with] *against the tire inner face, and in so doing to become laterally deformed for continuously engaging therewith over an extended area surrounding the proximate end of the injury opening.*

11. in the general form of a *single* roll having an elongated axis disposed transversely of the injury opening, the inner and outer radial portions of the head roll being respectively compressed and stretched to tension the head into a state of increased firmness, and a portion of the outer surface of the head overlying the inner face of the tire [to engage] *being deformed to scalingly engage* therewith over an extended area immediately adjacent the injury opening *thereby* to block the insert from longitudinal movement through the injury opening toward the outer end thereof.

14. the form of an eye-roll head in engagement with the inner surface of the tire.

16.

*general form of an eye-roll head having an elongated axis disposed transversely of the injury opening. the inner and outer radial portions of the eye-roll head being respectively compressed and stretched to tension the head into a state of increased firmness, and a portion of the pliable facing component affixed to the outer surface of the head overlying the inner face of the tire being deformed to pressure-engage therewith continuously over an extended area immediately adjacent and around the injury opening to provide thereat an air-seal effective also to block the insert from longitudinal movement through the injury opening toward the outer end thereof.*

[A4012]

Loop produced by defendants' inserts when installed using instructions on defendants' kits.

Loop does <u>NOT</u> have a diameter with a peripheral curvature of 270° nor engage flatwise an area surrounding the opening to provide a seal.

Loop is <u>NOT</u> in sealing position against the inner tire face nor does it engage therewith over an extended area.

Loop is <u>NOT</u> deformed into state of increased firmness <u>to</u> sealingly engage the inner tire face.

Loop is <u>NOT</u> an "eye roll head" as this coined term is <u>defined</u> by plaintiff.

Loop is <u>NOT</u> deformed to pressure engage the inner face of the tire around the injury opening.

Loop <u>DROPS OFF</u> in use and has <u>NO</u> sealing function.